The State v. Stanley.

THE STATE v. STANLEY.

1. **Criminal law**: INDICTMENT: MURDER. Indictment, the body of which was in the following form: "The said G. S., on etc., in, etc., in and upon the body of one W. P., then and there, being willfully, feloniously, deliberately, premeditatedly, by lying in wait, and of his

The State v. Stanley.

malice aforethought, did commit an assault with a deadly weapon, being a pistol, then and there held in the hands of the said G. S., and loaded and charged with powder and bullet, and then and there the said G. S. did, by lying in wait, with the specific intent to kill and murder the said W. P., willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, shoot off and discharge the contents of said deadly weapon at, against, into and through the head and body of the said W. P., thereby willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, inflicting upon the head and body of the said W. P. a mortal wound, of which mortal wound the said W. P., then and there, did die." *Held*, 1st. That the indictment was sufficient as charging murder in the first degree; 2d. That the time of the death was sufficiently alleged, as being at the time and place when and where the assault was made; 3d. That the indictment was sufficient as charging that the deceased was a human being.

2. Instruction: ERROR WITHOUT PREJUDICE. The refusal of an instruction cannot be successfully complained of as error, when the substance of the instruction refused is embraced in the instructions given by the court.

3. Criminal law: SELF-DEFENSE: ONUS. The defendant, in a prosecution for murder, is not entitled to avail himself of the plea of self defense, if he sought the deceased with a view to provoke a difficulty or bring on a quarrel. The *onus* is upon the prisoner to show that, subsequently, and before making the assault, he changed this intent.

4. —— INDICTMENT: INDORSEMENT OF WITNESSES: MISNOMER. The mere *misnomer* in respect to the Christian name of a witness, indorsed on the indictment, will not prevent the State from using him on the trial, when his identity sufficiently appears from the facts.

*Appeal from Story District Court.*

SATURDAY, FEBRUARY 24.

GEORGE STANLEY was indicted at the September term, 1870, of the district court of Story county, for the murder of William Patterson, and, at the April term following, was put upon his trial and convicted of murder in the first degree. He now prosecutes this appeal.

*G. W. Ball* for the appellant.

*H. O'Connor*, attorney-general, for the State.

The State v. Stanley.

Beck, Ch. J. — We have given the record in this case a most patient and careful examination, and have considered 1. Criminal all points therein that may be the basis of law: indict- ment: murder. inquiry, or demands consideration. None such have escaped the vigilance of the counsel for the prisoner, who has faithfully and ably discharged his duty, in presenting the case to this court. We have observed no point in the record, upon which an objection with propriety or reason may be founded, that has not been called to our attention in the argument of counsel. In passing upon the case, we will consider the objections in the order they are presented in his brief.

I. The indictment charges the crime, of which the prisoner stands convicted, in the following language :

"The said George Stanley, on the 15th day of June, A. D. 1870, in the county aforesaid, in and upon the body of one William Patterson, then and there being willfully, feloniously, deliberately, premeditatedly by lying in wait, and of his malice aforethought, did commit an assault with a deadly weapon, being a pistol then and there held, in the hands of the said George Stanley, and loaded and charged with powder and bullet, and then and there the said George Stanley did, by lying in wait with the specific intent to kill and murder the said William Patterson, willfully, feloniously, deliberately, premeditatedly and of his malice aforethought, shoot off and discharge the contents of said deadly weapon, being the powder and bullet aforesaid, at, against, into, and through the head and body of the said William Patterson, thereby willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, inflicting upon the head and body of the said William Patterson a mortal wound, of which mortal wound the said William Patterson then and there did die."

The following sections of the Revision are the only statutory provisions, relating to the crime of murder, necessary to be now considered.

"Sec. 4191. Whoever kills any human being, with

malice aforethought, either express or implied, is guilty of murder.

" Sec. 1492. All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, mayhem, or burglary, is murder of the first degree, and shall be punished with death.

" Sec. 4193. Whoever commits murder, otherwise than is set forth in the preceding section, is guilty of murder of the *second degree*, and shall be punished by imprisonment in the penitentiary for life, or for a term of not less than ten years.

" Sec. 4194. Before the trial of an indictment for murder, the jury, if they find the defendant guilty, must inquire, and by their verdict ascertain whether he is guilty of murder of the first or second degree."

The first objection made by the prisoner's counsel is, that the indictment does not charge a crime which, under the statute, amounts to murder in the first degree, or in fact to murder in the second degree. He insists that it is not charged that the killing was perpetrated by lying in wait or in any other manner that would amount to a willful, deliberate and premeditated killing. The position assumed is that, while it is charged that the assault was willful, deliberate and premeditated, with the intent to kill and murder, there is no averment that the *killing* was done willfully, deliberately, premeditatedly or by lying in wait, nor is there an averment of killing at all.

The indictment avers that the assault — the act of the prisoner — was done willfully, deliberately, premeditatedly and by lying in wait, with the specific intent to kill and murder, inflicting, thereby, a wound upon the body of William Patterson of which he died. The act and intent of the prisoner is sufficiently stated, if death resulted therefrom, to make the crime murder in the first degree. The

allegation of killing, claimed by counsel to be necessary, would only serve to indicate the result or consequence of the assault — the act — set out in the indictment. But the consequence of the act is clearly set out in the averment of the indictment that the assaulted and wounded man did die. The averment or charge in the indictment is made in clear and unmistakable language, that the act of the prisoner caused death; an averment of killing would amount to no more. No form of expression or particular words are necessary in order to set out the ingredients of an offense charged in an indictment; ordinary language, if one of a common understanding may know thereby what is intended, is sufficient. Rev., §§ 4657–4660.

An indictment similar to the one before us, in omitting to aver that the accused did kill and murder the deceased, was held sufficient in *The State* v. *O'Neil*, 23 Iowa, 274. It contained no words alleging the killing or murder, but an averment, similar to the allegation in the indictment before us, that the deceased died of the wounds which he received from the weapon used by the accused. *Fouts* v. *The State*, 4 Greene, 500; *The State* v. *McCormick*, 27 Iowa, 402; *The State* v. *Watkins*, id. 415; *The State* v. *Boyle*, 28 id. 522, and *State* v. *Knouse*, 29 id. 118, contain nothing in conflict with the foregoing views.

II. It is urged that the time of the death is not sufficiently alleged. The indictment, after setting out the time and place of the assault, and after describing the wounds inflicted thereby, avers that, of these wounds, "the said William Patterson then and there did die." This language is incapable of being misunderstood, and indisputably points to the time and place when and where the assault was made, which are specifically stated as the time and place of the death. Under the statutes above cited, the averment of the time of the death is sufficient.

III. Counsel claims that the indictment, following the

The State v. Stanley.

words of the statute (§ 4191), should have alleged that the deceased was a human being. This has never been held necessary. The language of the indictment, and the name applied to the deceased, are always used to describe men, human beings. It will be presumed that the indictment is understood according to the import of the common language used therein.

IV. The prisoner's counsel asked the court to instruct the jury, that verbal admissions of the accused, made out **2. Instructions: error without prejudice.** of court, as they are liable to be misunderstood, are regarded as weak evidence, and should be received with caution. The instruction was refused, but was substantially given in another form, with the addition that, under the statutes of the State, such evidence alone would not authorize a conviction. As given by the court, it was as beneficial to the prisoner as it could have been in the form presented by his counsel. He was not prejudiced by this action of the court.

V. The same instruction, asked by the prisoner's counsel, directs the jury that they should consider and weigh certain facts proved in the case, reciting them. The instruction, in the form presented, amounts rather to a commentary upon the weight of the evidence, and for that reason was properly refused. But, had it been unobjectionable upon this ground, its refusal did not predjudice the prisoner, for the court, in an instruction given the jury, directs them to consider carefully and with deliberation all the facts given in evidence upon the trial, thus covering the substance of the instruction so far as it was at all admissible.

VI. The tenth and eighteenth instructions are regarded by counsel as objectionable. The first one is to the effect, that a specific intent to take life, premeditated and harbored in the mind, is a necessary element in the crime of murder in the first degree. The objection is founded upon the idea that the instruction directs the jury that this specific, premeditated intent, alone constitutes the crime.

It cannot be so understood. It is designed to inform the jury that such intent was one of the ingredients of the crime, and it is well and fairly calculated to convey that idea. The eighteenth instruction explains to the jury what may be regarded as "lying in wait," as expressed by the statute, and fairly illustrates it by reference to the facts of the case, informing them, if they found from the evidence such facts, the defendant was guilty of murder in the first degree.

VII. It is insisted that an instruction, given to the jury, wherein they are informed that confessions of the accused, are not conclusive against him, and should be received with great care, were inapplicable to the evidence, and calculated to prejudice defendant before the jury. This position is based upon the assumed fact, that no confessions were, in fact, given in evidence. It is complained that this instruction would induce the jury to attach too much importance to certain declarations of the prisoner, and to regard them as confessions. But there were, in fact, declarations of the accused in the nature of confessions given in evidence to the jury. While it was proper that they should be received by the jury, the court correctly admonishes them to receive this evidence with caution.

. VIII. The court directed the jury that the defendant could not have "the benefit of the plea of self-defense if 3. CRIMINAL he sought the deceased with a view to pro-LAW: self-defense: onus. voke a difficulty or to bring on a quarrel." Counsel claim that this is erroneous because, using his own language, "there might have been a change of conduct or action on defendant's approaching deceased, and, if so, he would be entitled to the benefit of the plea." This is very true, but that change of conduct and action the prisoner is required to prove. This is the doctrine of *The State of Iowa* v. *Neeley*, 20 Iowa, 109–116.

IX. A witness named Silas W. Tompkins was permitted to testify against defendant's objection      The

The State v. Stanley.

4. —— indictment: indorsement of witnesses: misnomer. name N. W. Tompkins was indorsed upon the indictment. Abram Dayton also testified against the prisoner's objection, the name A. B. Dayton being upon the indictment. It was shown to the court that both of these witnesses gave evidence before the grand jury; that the name of the first appeared upon the minutes of the grand jury in the case as Silas W. Thompkins, and, as to the second, it was shown that no man named A. B. Dayton was known in the neighborhood. Both the witnesses were permitted to testify; the court ordered Silas W. Thompkins' name to be correctly indorsed upon the indictment. There is no error in these rulings of the court. The witnesses will be regarded as being sufficiently described. See *The State* v. *McComb*, 18 Iowa, 43. This is unquestionably true in this case, as there was no claim or pretense that the prisoner was or could have been prejudiced by the misnomer of the witnesses.

X. The last point made by counsel is, that the conviction is not warranted by the evidence. We have given the evidence careful and deliberate consideration, and feel well assured that the guilt of the prisoner is clearly and satisfactorily established. The evidence against him was of an entirely circumstantial character, and is not at all intricate, nor given by a great number of witnesses. There can be no doubt but the jury were justified in their conclusion that the prisoner took the life of William Patterson, under circumstances that make the crime murder in the first degree. The deceased was a foreman, or "section boss," upon the Chicago & Northwestern Railroad, and lived at Ames, in Story county, having charge of the repairs of that road at and near that place. On the 15th of June, 1870, he was employed, with a certain number of hands, in repairing the road about one-half mile east of Ames. About 5 o'clock, in the afternoon, he left the hands for the purpose of returning to Ames, directing them

to follow him along the railroad after certain work was completed. He was observed by the men after he had left them, when he had gone about half the way to the village, examining the track of the railroad. The men on their return to Ames, arriving at about the place they had last seen him, found him lying dead upon the railroad track. The cause of his death was two wounds from pistol balls; one ball entering an eye and passing out at the ear, the other entering at the top of the head. Either of them would have alone caused death. A pistol was found near him and a box of pistol cartridges in his hand. He was not known to have had or carried a pistol or other weapon. The circumstances of Patterson's death, especially the location and nature of his wounds, render the supposition impossible that he died by his own hands. Either wound would have caused death, and it is highly improbable, if not impossible, that he could have, with his own hand, after he had received one wound, inflicted the other. That his life was taken by another appears morally certain. Who was the perpetrator of this crime? The evidence connecting the prisoner with it, as we have before remarked, is of a circumstantial character, and is as follows:

About one year before Patterson's death, he had a quarrel with the prisoner, which resulted in an encounter between them. In the affray, the prisoner was stabbed by Patterson. It seems that some transaction, in which Patterson's wife was concerned, was the cause of the fight. The prisoner, though not seriously hurt, resolved upon avenging with his own hand his injury. He avowed his determination to more than one of taking Patterson's life. These threats were not made immediately after the fight, or when he was under excitement, but in his cool moments, some time after the occurrence just related. We have, in the evidence, no account of him until a few days before Patterson was killed. It appears that, during this time,

he did not remain in the neighborhood. Four or five days before Patterson was killed he was seen upon the railroad, one mile from Ames, and within one-half of a mile of the place where Patterson was killed. He made inquiry, of a party with whom he conversed, concerning the "section boss," where he lived, and what was his name. He said that he wanted to get work. Two days before Patterson was killed he was seen near the place where the crime was committed. The next day he was seen by the same witness at or near the same place. At this time Patterson had just passed with his man. The prisoner arose out of a ditch, and for some time looked at Patterson. Patterson did not see him. He then went back to the ditch, where he had come from. About one hour and a half or two hours after Patterson was killed, he called at a house about seven or eight miles from Ames, and within one-half mile from the railroad, for the purpose of obtaining a drink of water. He appeared fatigued from rapid walking, and perspiring profusely, more so than is usual for one making ordinary physical exertions. He had on old clothes, which are described much as those he wore when seen near the place of the crime. The next day he applied to those in charge of a special train, upon the Central Railroad, to be taken to Eldora, and at first was refused; but these men having heard of the killing of Patterson, and having received a description of the prisoner as the probable perpetrator, admitted him upon the train, supposing, from his appearance, that he was the one who had committed the crime. When the train reached Eldora, he was arrested. He gave false and contradictory statements in regard to himself and his acquaintance with Patterson. When he came to the train, he appeared anxious to get forward on his journey. He, at the time, had some new clothing.

At the place where Patterson was killed there was a deep ditch, running off from the railroad, in which a man could easily conceal himself. In it were found indications

that some one had been there. After his arrest, in a conversation regarding Patterson's murder, with one of the witnesses, who remarked to him that if Patterson's wife was guilty, she ought to suffer, he said : " I expect to die for it, but so help me God, she knew nothing about it." This declaration was made without any inducements being held out to him, and no influences were used to extort it.

The pistol found near Patterson, when he was first discovered after the crime, was identified by a witness as resembling one which he had before seen in the prisoner's possession. But it was shown by an affidavit, which was made by the prisoner for a continuance, that a witness, whose attendance could not be obtained, would testify that the pistol seen by the former witness in his possession had been borrowed by the prisoner of the absent witness, and had been returned to him. The statement of the affidavit, as to the witness' testimony, was, under the law, permitted to go to the jury as the evidence of the witness on that point. This was all the evidence offered by the prisoner.

It must be mentioned that a witness for the State testified that about the time that Patterson was killed, she heard the report of a firearm in the direction of the railroad. Soon after she saw a man in the same direction cross the railroad and go into the field. She described him as differing in appearance from the prisoner. This was near where Patterson was found.

The defendant made no attempt to explain any of the circumstances and facts given in evidence against him. He introduced no proof as to where he was at the time of, or for two or three days before, the killing of Patterson, in short, except the evidence above stated, there was, before the jury, not one word of testimony in his behalf. If he be innocent of the horrible crime of which he stands charged, it is not within the range of possibilities that no explanation could be given of the circumstances pointing to him as the perpetrator. Weighing the evidence before

us most cautiously, and considering it all with great care, we are thoroughly satisfied that the jury were authorized thereon, without a reasonable doubt, to convict the prisoner.

The grave duty is imposed upon us, which we discharge with a due sense of our responsibility to God and the State, to pronounce the decision of this court, affirming the judgment of the court below, condemning the prisoner to suffer the extreme penalty prescribed by the law for the heinous crime of which he stands convicted. This penalty he must suffer, unless it be otherwise ordered by the executive of the State, in the exercise of the authority conferred upon him by the constitution and the laws.

Affirmed.