## Court of Appeals.

May, 1905.

## THE PEOPLE v. JAMES BREEN.

(181 N. Y. 493.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of an indictment for homicide examined and held sufficient to sustain a verdict convicting the defendant of the crime of murder in the first degree.

2. WHEN EXTRACTS FROM OPINION IN COURT OF APPEALS ARE PROPERLY READ AND INCORPORATED IN CHARGE.

Extracts from an opinion of the Court of Appeals relating to the questions of premeditation, deliberation and criminal intent, together with extracts from opinions in cases cited therein, are properly read and made a part of the charge of the trial judge, where they correctly state well-recognized general principles which, when read with other portions of the charge, define with precise accuracy the rules applicable to those questions in the case at bar; and the fact that the opinion was based upon a case particular in its facts and limited in its legal bearing, does not render the charge the proper subject of criticism, especially in a case where what was read was specially appropriate.

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York, rendered October 28, 1903, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Stephen J. O'Hare for appellant. The learned court erred in refusing to advise the jury to acquit the defendant on the ground that the evidence was insufficient to warrant the defendant's conviction of the crime of murder in the first degree. (Code Cr. Pro. § 410.) Prejudicial error warranting the reversal of the judgment is contained in the charge to the jury. (People v. Fish, 125 N. Y. 153; People v. Martin, 33 App.

Div. 284; People v. Corey, 148 N. Y. 490; McKenna v. People 81 id. 360; 11 Eng. & Am. Ency. of Law [2d. ed.], 111.) Justice requires in this case the granting of a new trial within the provisions of section 528 of the Code of Criminal Procedure, even in the absence of exceptions taken in the court below. (People v. Kennedy, 164 N. Y. 449; People v. Fielding, 158 id. 542.)

William Travers Jerome, District Attorney (Robert C. Taylor of counsel), for respondent. The People made out a case of murder in the first degree and every element of guilt was proved. (People v. Silverman, 181 N. Y. 235; People v. Ferraro, 161 id. 365; People v. Schmidt, 168 id. 568, 571; People v. Zachello, 168 id. 35, 39; People v. Sliney, 137 id. 570; People v. Trezza, 8 N. Y. Cr. Rep. 283; People v. Pugh, 167 N. Y. 524.) No injustice to the defendant can be discovered because of anything in the charge, and unless the court can discover actual injustice it cannot reverse in the absence of an exception. (People v. Tobin, 176 N. Y. 278; People v. Pallister, 138 id. 601; People v. Rodawald, 177 id. 408; People v. Conroy, 97 id. 77; People v. Demick, 107 id. 13; People v. McCallum, 103 id. 587; People v. Hughes, 137 id. 29; People v. Taylor, 138 id. 398; People v. Koenig, 180 id. 125; People v. Martell, 138 id. 595.)

WERNER, J.: A brief view of the facts as established at the trial and agreed to by counsel for the appellant, seems to us to exclude every element of reasonable doubt as to the justice of the judgment herein upon the merits. On the 16th day of September, 1903, the defendant shot and killed one William .H. Keyes. The defendant, then about twenty-one years of age, had a criminal record, having been several times convicted of various offenses, and having been out of prison less than a month at the time of the homicide. The deceased had con-

ducted a saloon and hotel at the corner of Water and Catharine streets in the city of New York. Shortly after midnight of the day named, the defendant came into the barroom of the deceased and asked for Cassidy, Lalor and Minor, stating that if they were there he would put a bullet into them. While the defendant was speaking Cassidy came in and a conversation ensued, in which the former accused the latter of "looking for him," and said, "if you were worth it I would put a bullet into you; I have a good mind to break your jaw anyway." To this Cassidy replied, in substance, that he had not been "looking for" the defendant. At this juncture the deceased came out from behind the bar and stated that the defendant would have to get out if he wanted to make trouble, and if he and Cassidy had anything to settle they would have to do it outside. The defendant "backed up" toward the door until he got to the cigar lighter, when he asked the deceased if he could light a cigarette. Receiving an affirmative answer, he lighted a cigarette and went out of the front door on Catharine street. Cassidy, who boarded with the deceased, then took the key of his room and started to go upstairs, but before he had reached his room the defendant reappeared at the side entrance, opened the " summer doors " and addressed the deceased in foul and obscene language. The deceased walked toward the defendant, probably for the purpose of ejecting him from the premises, and when the former reached the " summer doors " the latter drew a pistol and fired. The bullet penetrated the heart of the deceased; he became unconscious almost immediately, and died within a few minutes. The defendant fled. At the corner of Cherry and Oliver streets, two blocks from the scene of the homicide, he encountered a policeman to whom he at once exclaimed, " I didn't do it, I didn't do it." The policeman took him into custody, searched him, and found upon his person a thirty-two calibre five-chamber revolver, the barrel of which was still warm, with one chamber empty, another containing a discharged shell, and the re-

maining three loaded with undischarged cartridges. The story of the homicide, here sketched in barest outline, was sworn to by William F. Kiley, an eye-witness to the whole affair; by Peter Cassidy, with whom the defendant had attempted to quarrel in the saloon, and who had not yet reached his room when the fatal shot was fired; by Joseph O'Toole, who sat with Kiley in the saloon, saw the defendant, heard his foul address to the deceased and the shot which followed; by William Pendleton, who was asleep in the saloon and was awakened by the shot; by Felix Danielson, who was seated on a bench in front of his home just across the street, witnessed the shooting and the flight of the man who did it; by George Wilson, who lived two doors from Danielson, heard the argument in the saloon, saw the defendant come out, and reappear at the side door, heard his words to the deceased, saw the latter approach the doors, heard the shot and saw the defendant run toward Oliver street; by William H. Roy, the policeman who arrested the defendant under the circumstances already mentioned; and by the coroner's physician and the widow of the deceased, whose testimony established to a certainty the death and its cause. Rarely, indeed, is it possible for a prosecuting officer to supplement a charge of murder with so complete and convincing an array of proof as was presented against the defendant.

The defendant's story is brief and incredible. He admits having been in the barroom of the deceased on the night in question and having seen there the deceased, and the witnesses Kiley, O'Toole, Cassidy and Pendleton. He testified that while he was there, waiting for a glass of beer, Cassidy came in somewhat intoxicated and began talking to him, when the deceased interposed and told them to settle their troubles outside. That thereupon he, the defendant, went out and started for home; that when he got near the corner of Oliver and Water streets he heard the report of a pistol, and thinking it was a job to shoot him as his brother had been shot, he hastened his steps

and turned into Cherry street, where he encountered a police officer; he stated that the police officer asked him where he was going and he replied " home;" that the officer then asked him if he had fired a shot and he said he had not; that thereupon the officer told him he lied, applied vile epithets to him, attacked him with a club and then asked him if he had a revolver; that he said " yes," produced it and turned it over to the officer; that he was then taken back to the saloon of the deceased, where the officer asked every person present if he knew anything about the shooting, and every one denied any knowledge of the affair; that he was then taken to the police station and on the way was again beaten by the policeman with a club. The defendant sought to account for the possession of the revolver by stating that he had received it from his brother some days before this homicide, to protect himself against the " Cherry Hill gang," some of whom were suspected of having shot this same brother and wounded him so severely that he was in the hospital, where the defendant says he visited him on the night of this homicide. There is neither evidence nor suggestion, however, tending to connect either the deceased or Cassidy with the " Cherry Hill gang," or with any previous threats against the defendant, or trouble with him.

The only circumstance in the case that is even seemingly corroborative of the defendant's story is found in the testimony of the coroner's physician who performed the autopsy upon the body of the deceased. This physician stated that the bullet penetrated the chest at the third interspace between the third and fourth ribs, passing through the heart. The direction was backwards, to the right, somewhat downward, passing through the heart and diaphragm into the posterior substance of the liver, where it was found three and a half or four inches below the wound of entrance. At first glance this description of the bullet's course seems inconsistent with the story of the shooting told by the witnesses for the prosecution. But this apparent

inconsistency rests wholly upon the disparity in the stature of the two men, supplemented by the assumption that both were standing erect at the instant of the shooting. There is evidence that the deceased was taller than the defendant, but the extent of the difference in height is not shown. The record is barren of evidence as to the exact posture of the men when the shot was fired. Under these circumstances it is idle to speculate upon the causes that deflected the bullet from the line it would probably have taken if both men had been standing erect and motionless. It is to be observed, moreover, that the angle of forty-five degrees at which the bullet ploughed its way backward and downward through the vitals of the deceased, was so great that it would not be accounted for by the difference of a few inches in the height of either man. If we were permitted to enter the realm of imagination, we might invoke many possible theories to dissipate the fanciful doubts which such circumstances as the one under discussion are calculated to create. It would not be difficult to believe, for instance, that the deceased went to the side door of his saloon to eject the defendant from the premises, and that in doing so the former laid his hands upon the defendant, as testified to by Danielson. The unexpected production of a revolver at this juncture could easily have produced in the relative postures of the two men changes so sudden and kaleidoscopic as to defy accurate observation or description. Be that as it may, when we turn from these theoretical speculations to the stern facts of the record, we are admonished that five unimpeached witnesses and a strong group of convincing circumstances point to the defendant as the slayer of Keyes, and they point to no one else. Upon this array of evidence we do not hesitate to say that there was no error in the refusal of the trial court to advise the jury to acquit the defendant of the charge of murder in the first degree. The only defense was a flat denial of any shooting by the defendant. There was no attempt to mitigate, excuse or

justify. The sharply defined issue created by the utterly irreconcilable stories of the witnesses for the prosecution on the one hand and the defendant on the other, was necessarily and properly submitted to the jury. Under proper instructions as to the elements of premeditation and deliberation, the jury have said that both were established beyond a reasonable doubt. Their decision is not against the weight of evidence, but in accordance with it. Under such circumstances the verdict must stand (People v. Shea, 147 N. Y. 99; 10 N. Y. Crim. 15), unless there are other valid reasons for setting it aside.

At the trial a number of exceptions were taken to rulings and to the charge that are not presented as part of this appeal. We have examined them all, however, and deem none of them sufficiently important or serious to warrant a reversal of the judgment. But defendant's counsel now criticises the charge of the learned recorder as to matters that were not made the subject of exception at the trial, and these criticisms we shall briefly examine in the light of the rule stated in People v. Tobin (176 N. Y. 278; 17 N. Y. Crim. 517), to the effect that in capital cases errors not excepted to will not be deemed sufficient grounds for reversal unless the verdict is against the weight of evidence or against the law, or that justice requires a new trial. (Code Crim. Pro. § 528.)

The criticisms upon the charge above referred to are so comprehensive that we must, of necessity, paraphrase them somewhat briefly and pointedly. It is said that the trial court erred in its charge by reading copious extracts from the opinions of this court in People v. Conroy (97 N. Y. 62; 2 N. Y. Crim. 565), containing quotations from other opinions rendered in Leighton v. People (88 N. Y. 117); People v. Majone (91 N. Y. 211; 1 N. Y. Crim. 94) and Foster v. People (50 N. Y. 609). These quotations, too voluminous for complete reproduction here, relate to several subjects of vital importance upon every trial for the crime of murder in the first degree. The

first of these, both in order and in importance, are the subjects of premeditation and deliberation. As we understand the criticism of counsel directed to this part of the charge, it is that the opinion in the Conroy case was based upon a particular state of facts, upon which this court disagreed with the late General Term as to the propriety of granting a new trial for insufficiency of evidence to warrant a conviction of murder in the first degree. Granting counsel's premise, we cannot yield to his conclusion that it was error to read from that case, if what was read was of universal application to such trials, or was specially appropriate to the facts of the case at bar. Turning to the portion of the charge relating to the subjects of premeditation and deliberation, we find such quotations as these: " If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design is formed at the instant of striking the fatal blow or whether it be contemplated for months. It is enough that the intention precedes the act, although that follows immediately."

" If the killing is not the instant effect of impulse, if there is hesitation or doubt to overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder."

" Under the statute there must not only be an intention to kill, but there must also be a premeditated and deliberate design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection or consideration upon upon the matter, for a choice to kill or not to kill, and for the formation of a definite purpose to kill. The human mind acts with celerity which it is sometimes impossible to measure, and whether a deliberate and premeditated design to kill was

formed must be determined from all the circumstances of the case."

In these excerpts we recognize familiar judicial landmarks that have long been recognized as safe guards by our trial courts of criminal jurisdiction, and as satisfactory precedents by this court. As to their applicability to the case at bar, it is enough to say that if they had been specially created for it they could not be more correct, and they lose none of their weight because they happen to have been taken from a case peculiar in its facts and limited in its legal bearing.

Upon the subject of intent the learned recorder also quoted from the opinions in the cases of Conroy and Foster (*supra*). In the Conroy case the learned author of the opinion wrote: "Whenever intent is made an element in determining the character of an act, it is in accordance with a general observation and experience to infer its existence by reference to the laws which have been usually and generally found to control human conduct. Indeed, this is the only method by which the intent can be made to appear. The intent formed is the secret and silent operation of the mind, and its only visible physical manifestation is in the accomplishment of the thing determined upon. The individual whose intent is sought to be ascertained may remain silent, or if he speaks may and probably will, if he has a crime to conceal, speak untruly, and thus the mind is compelled from necessity to revert to the actual physical manifestations of the intent, exhibited by the result produced, as the safest, if not the only proof of the fact to be ascertained. In the Foster case the rule was thus expounded: "It is a fundamental rule of evidence, of very general application, founded upon observation and experience, that a man is presumed to intend the natural consequence of his acts;" and in the Conroy case quoting from Starkie on Evidence (p. 848): "There is a general presumption in criminal matters that a person intends whatever is the natural and probable consequence of his own acts."

These judicial declarations upon the law of evidence relating to criminal intent correctly state well-recognized general principles which, when read with other portions of the charge, define with precise accuracy the rule applicable to the subject of intent in the case at bar, and we think it was not error to read them as a part of the learned recorder's charge.

In conclusion we simply add that the most careful examination of this record has revealed nothing that gives us the right to say that the interests of justice require a new trial, and we, therefore, hold that the judgment of conviction herein must be affirmed.

CULLEN, Ch. J., GRAY, O'BRIEN, BARTLETT, HAIGHT and VANN, JJ., concur.

Judgment of conviction affirmed.