## COURT OF APPEALS.

### June 7, 1910.

## THE PEOPLE v. WILLIAM GILBERT.

### (199 N. Y. 10.)

(1). MURDER—VERDICT SUSTAINED.

On review of the facts on conviction of defendant for murder in the first degree, *held*, that the case was clearly for the jury; that the verdict is supported by the evidence, and that the judgment should be affirmed.

(2). SAME—PREMEDITATION AND DELIBERATION.

Upon consideration of the question arising upon exceptions to the charge involving the subject of deliberation and premeditation, the rule is stated to be that, while the time for reflection is not measured in minutes or seconds, it is measured by facts. The time must be long enough to make a choice, as the result of thought and reflection, and to act upon the choice thus made. It is impossible to measure this period by the ordinary method of measuring time, and, hence, it is necessary to measure it by what must be done in order to satisfy the statute which requires a deliberate and premeditated design. *Held*, that this rule was complied with in the charge given on the trial under review.

(3). SAME—CHARGE—EVIDENCE OF GOOD CHARACTER.

At the close of the charge the counsel for the defendant excepted to what he claimed the court had charged in these words: "If you are satisfied of the defendant's guilt, evidence of good character is of no importance." The court thereupon remarked: "In that connection I told them that they were to consider the evidence of good character in arriving at a conclusion as to whether he was guilty or not." The counsel then said: "I desire also to except to that part of the charge in which you say, 'after reaching the conclusion that he is guilty, then evidence of good character is of no account.'" The court at once said: "I make the same observation as to that. It is to be considered upon the question of reaching a conclusion as to whether he is guilty or not." *Held*, that while the detached portions of the charge excepted to might, standing alone, have been erroneous, when read with the context, as the law requires, there was no reversible error.

(4). SAME—DEMURRER TO INDICTMENT BECAUSE IT DID NOT ALLEGE KILLING OF " HUMAN BEING."

Defendant demurred to the indictment. The objection relied upon is that it does not appear on the face of the indictment that the victim of the crime was a human being. The indictment alleged, after setting out time, place and means of the murder, that the defendant did thus kill and murder (the person named) feloniously and with malice aforethought. *Held*, that the use of the word "murder" implies that a rational being is the subject of the crime, and the use of an ordinary given name and surname raises the presumption that a human being is meant; the word "feloniously," in connection with the other allegations, carries a like implication. The objection is purely technical, and technical objections are no longer regarded as serious unless they are so thoroughly supported by authority that they cannot well be disregarded even under the latitude of the statute relating to the subject.

(Argued May 16, 1910; decided June 7, 1910.)

APPEAL from a judgment of the Supreme Court, rendered December 29, 1909, at a Trial Term for the county of Cattaraugus, upon a verdict convicting the defendant of the crime of murder in the first degree. Also, appeal from an order overruling a demurrer to the indictment and from an order denying a motion for a new trial.

On the 29th of December, 1909, the defendant was convicted of the crime of murder in the first degree upon an indictment charging that on the 22d of August, 1909, at the city of Olean, in the county of Cattaraugus, with deliberation and premeditation, he did "kill and murder" one Viola Hughes by shooting her with a revolver. The facts, so far as material are stated in the opinion.

*M. B. Jewell,* for appellant. The verdict of the jury to the effect that the defendant intentionally fired the shot which killed Viola Hughes is not established beyond a reasonable doubt. (*People v. Fitzgerald,* 156 N. Y. 253; *People v. Kelly,* 11 App. Div. 495; *Ruppert v. B. H. R. R. Co.,* 154 N. Y. 90;

*People v. Harris,* 136 N. Y. 423; *People v. Ledwon,* 153 N. Y. 10; *People v. Owens,* 148 N. Y. 648; *People v. Gluck,* 188 N. Y. 167.) The court erred in instructing the jury upon the question of premeditation and deliberation. (*People v. Jackson,* 196 N. Y. 362; *People v. Barberi,* 149 N. Y. 267.) The court erred in the charge to the jury upon the question of the effect of evidence of the good character of the defendant. (*People v. Pollock,* 51 Hun, 613; *People v. Kelly,* 11 App. Div. 495; *People v. Hughson,* 154 N. Y. 153; *People v. Bonier,* 179 N. Y. 315; *People v. Friedland,* 73 N. Y. S. R. 516; *Rensen v. People,* 57 Barb. 324; *Cancemi v. People,* 16 N. Y. 501; *People v. Weilman,* 44 Hun, 187.) The demurrer to the indictment should have been sustained. (*People v. Lee Lock,* 137 Cal. 590.)

*George W. Cole,* for respondent. The evidence that the defendant killed the deceased deliberately and premeditatedly was abundant. (*People v. Filippelli,* 173 N. Y. 509; *People v. Conroy,* 97 N. Y. 62; *People v. Gambacarto,* 197 N. Y. 181; Wharton on Homicide, § 104; *People v. Clark,* 7 N. Y. 385; *Thomas v. People,* 67 N. Y. 218; *People v. Leighton,* 88 N. Y. 117; *People v. Majone,* 91 N. Y. 211; *People v. Hawkins,* 109 N. Y. 408; *People v. Ferraro,* 161 N. Y. 365; *People v. Schmidt,* 168 N. Y. 568; *People v. Rodawald,* 177 N. Y. 408; *People v. Governale,* 193 N. Y. 581.) The instruction given to the jury as to premeditation was a correct statement of the law. (*People v. Conroy,* 97 N. Y. 62; *People v. Leighton,* 88 N. Y. 117; People v. *Majone,* 91 N. Y. 211; *People v. Ferraro,* 161 N. Y. 365; *People v. Breen,* 181 N. Y. 493.) The court correctly charged the jury as to the effect of the evidence of good character. The demurrer to the indictment was properly overruled. (Code Crim. Pro. § 282; 1 McClain on Crim. Law, § 374; Wharton on Homicide [3d ed.], 865, § 569; *State v.*

*Stanley,* 33 Iowa, 526; *Palmer v. People,* 138 Ill. 356; *Merrick v. State,* 63 Ind. 327.)

VANN, J.:

Upon the trial it was conceded that Viola Hughes was killed by the discharge of a self-cocking revolver held by the defendant in his right hand. The People claim that the shooting was deliberate and premeditated, while the defendant claims it was accidental and involuntary. The previous relations of the parties, their feelings and actions toward each other and the circumstances immediately surrounding the homicide become important in the effort to discover whether it was an accident or a crime.

On the 22nd of August, 1909, the date of the tragedy, the defendant, a colored man of previous good character, was unmarried and twenty-nine years of age, while Viola Hughes, the deceased, a colored woman, was twenty-two years of age and also unmarried. He was much attached to her and paid her marked attention for several months. They were engaged to be married, and the 26th of August, 1909, had been agreed upon as the date when the marriage was to take place. Their relations were friendly and intimate until the night of August 2nd, 1909, when they had a quarrel, as he told the district attorney after his arrest. According to his statement, she asked him if he was going to take her to a picnic to be held the next day, and he said that was his intention. He continued: "She wanted to know who I was going to dance with and I said the first dance with her and then with somebody else, and she got mad and drew a knife." They both attended the picnic on the day following this interview, but were not seen together, although, as he testified, they met during the evening in the park.

Up to this time he had seen her almost every night for three

or four months, but he never saw her alone again, although on two occasions they met in the presence of others, once about a week before the tragedy at a family party in the house of Frank Brooks, when games were played by all present, and once on the night before the tragedy, as will be noticed hereafter. On the first occasion, after leaving the house, the defendant lingered about for some time. A peculiar noise was heard outside about twenty minutes after he left, and Frank Brooks " set the dog at it," and, following the dog, saw the defendant a short distance from the house, and he said he had broken his suspenders. Brooks returned to the house and the defendant went on toward home.

Viola had been employed for more than a year as a domestic in the family of a physician in Olean, but about the time of the picnic she took a vacation and was visiting a young colored girl named Florence Brooks, the daughter of Frank Brooks, who lived in a suburb of the city. Many years before Brooks had married a sister of the defendant, but he had not lived with her for eight or ten years. Their three children, Florence, Manzella and Christina, together with David Pierce, a boarder who was engaged to be married to Florence, comprised the family of Brooks at the time of the homicide. During the three weeks that Viola was visiting at the Brooks' house the defendant called to see her eleven times, but she avoided him on each occasion. During this period, Charles Gayton, a young colored man who was a nephew of the defendant, took her out boating or fishing several times on the Alleghany river near which Brooks lived. Although Gayton's attentions to Viola were not very marked, they made the defendant jealous and he watched them carefully. On the evening of August 19th, three days before the tragedy, he entered the Brooks house with Frank Brooks and found Gayton inside apparently alone, but as he testified, he " believed at that time

that Viola had skipped upstairs and that she had been with Gayton in the room downstairs." On the night before the tragedy the defendant started for the Brooks house, and meeting Viola with Florence Brooks and David Pierce turned and walked back with Pierce, the two girls going ahead. They stopped at the post office for a moment while Florence went in to mail a letter and the girls then went to a show. While they were standing there the defendant, as he testified, told Viola that he would meet her at that place at about ten o'clock and go home with her after the show, and she said she would wait for him. She did not wait for him, however, but walked home with Florence. The defendant was told by a boy that the girls had gone home with Gayton and he went after them more than a mile to the Brooks house, reaching there at about eleven o'clock but did not gain admittance. Frank Brooks came home and finding him on the front porch crying, asked him what was the matter and he said that Viola would not talk to him and that he had never done anything to the girl. This conversation, however, which was sworn to by Brooks, was denied by the defendant when a witness on the stand.

The next day was Sunday, August 22nd, the date of the tragedy. About noon that day the defendant took a revolver from the bed of Mrs. Middleton, his aunt, with whom he lived, but did not tell her that he had taken it and he had never taken it before. It was a self-cocking revolver, known as a thirty-two short, with five chambers, of which four were loaded. He took no other cartridges with him, but he tried to find more. He was not in the habit of carrying a revolver, although he had sometimes used one to hunt woodchucks, but he usually hunted them with a Winchester rifle. After taking the revolver he went to the tannery where he was employed, a short distance from the Brooks house, and remained there for more than half an hour, walking around as if uneasy but, as he said,

for exercise. He then went to the Brooks house, but all of the family were absent. Shortly before he reached there Manzella Brooks had left the house and locked the front door, the back door being bolted on the inside. Viola was alone upstairs. Manzella went to the house of Mrs. Simmons, a near neighbor, and while there she and the members of the Simmons family for some reason watched the defendant. They saw him go to the Brooks house at about one o'clock. He went to the front door, knocked and tried the door but did not get in. He ran his hand along the casing above the door as if feeling for a key. He walked around the house several times, looked in the windows on the first floor, and stepping back looked up to the windows on the second floor and finally sat down under a tree, a short distance in front of the porch. Mrs. Simmons went over to the pump near the Brooks house for water, but the defendant, who knew her well and was but a few feet from her, did not speak to her. He testified that he saw Viola once through a window upstairs and thought that Gayton was in there with her. About four o'clock Florence came home, sat down on the porch and the defendant visited with her talking pleasantly for about fifteen minutes. He told her that he had come to take Viola out riding. In a short time, Brooks and Pierce, who had been blackberrying together, returned and after awhile the front door was unlocked and some members of the family went in, but the defendant did not enter the house for more than an hour.

The Brooks house faced north and the front door opened into a hall, the dining room being on the right hand and the parlor on the left. The hall, about five feet wide in front, was narrowed by a stairway to two feet eight inches at the rear. There was no entrance to the stairway from the hall, but there was one from the kitchen immediately at the rear of the hall. On the left of the kitchen was a small storeroom, with no furniture, except an old couch.

About half-past five the defendant, as he testified, looking through the hall into the kitchen, saw Viola there. Five minutes later he went into the kitchen himself, but Viola, Florence and Pierce had gone into the storeroom and closed the door. When he reached the kitchen he found no one there, but Gayton came in very soon, and seeing him standing near the door of the storeroom, said, "Hello, Will." Florence heard the salutation and came from the storeroom into the kitchen, closing the door after her. Pierce came out at about the same time and asked the defendant to take a seat, but he declined. At this time Gayton sat in a chair on the west side of the kitchen, Pierce took a seat on the south side, and Florence began to cut bread by a cupboard on the west side, while the defendant continued to stand by the wall near the door of the storeroom. Manzella had gone upstairs and Brooks was at the barn taking care of his horse. The defendant stepped to the door of the storeroom, when Viola met him in the doorway and tried to get by him, apparently intending to go upstairs. Speaking pleasantly, he said he wanted to talk with her, and, taking hold of her arm, asked her to come into the parlor. She said she wanted nothing to do with him. He said, "What have I ever done to you?" and she replied, "You have done a whole lot to me," and struggled toward the stairway, saying that she was going upstairs. He had hold of her by the left arm, and she grasped the thin casing of the stair doorway nearest the hall with her right hand. He pulled her into the hall, and in doing so, turned her around so that her back was toward him, and then both disappeared from the view of those in the kitchen, except that her right hand was seen still clasping the door casing. In a few seconds, from two to four, according to the recollection of most of the witnesses, a shot was heard in the hall, Viola whirled around into the kitchen, sank at the foot of the stairway and died almost instantly. The defendant stepped

from the hall into the doorway between the hall and kitchen, holding a smoking revolver in his hand. Pierce had arisen apparently to help Viola, and the defendant, pointing the revolver at him, said, " Stand back Dave, leave her alone." Pierce stopped, the defendant turned around and, without uttering a word, or making any exclamation, or showing any feeling, passed out through the hall with the revolver in his hand and went directly home. This is the version of all eye-witnesses, although Pierce at first was not positive that the revolver was pointed at him. There was some evidence tending to show that the witnesses in the kitchen could not all see the parties as they were near the hall, owing to a stove with a high oven which stood near the stairway, but the witnesses swore that they did see, and there was evidence tending to show that they could see.

The bullet entered the back of Viola just below the apex of the shoulder blade, about four and one-half inches to the left of the spine. It went through her body nearly on a level course, but in a diagonal direction, and passing through the left lung, the heart and the edge of the right lung, struck the inner wall of the chest. The point of termination of the course of the bullet in front was nearly on a level with the point of entrance in the back part of her body. The discharge burned a hole in her shirt waist over the bullet wound from one and one-half to two inches in diameter. After she fell, Brooks, who rushed into the kitchen on hearing the report of the revolver, saw smoke in her clothing where the bullet entered and smothered the fire with his hands.

About thirty minutes after the occurrence the chief of police went to the house where the defendant lived, and as he was walking around to the back entrance the defendant came out and said, " Chief, I will give myself up, I will go with you. I will go with you." He was much excited and was crying.

The officer asked him, "Where is the gun?" and he said Gayton had it. Another officer went for it, and when it was produced the defendant was asked if that was the gun and he said it was. On the way to the police station, as the chief of police testified, the following conversation took place between them: "Gilbert asked me if the girl was dead. I told him she was. I asked him if he shot her and he said he did. I asked him how he came to do that, and he said because she had promised to marry him and had gone back on him and throwed him, and he wanted to die and wanted her to die with him." He did not state to the officer that the shot was accidentally fired, or say anything more upon the subject, except that he wanted to go and see the girl.

About half-past seven in the evening, at the police office, Captain Lawler asked the defendant what he had been doing, and he replied that he went to the Brooks home that afternoon and couldn't get in; that he knew Gayton was in the house with Viola, and and when Florence returned he asked her if he could go in and see Viola, and she told him he could; that he went in and Viola came downstairs, followed by Gayton, and he asked her if she was going to hang around with Gayton or was going to stick to him; that he loved her better than he did his life; that she turned around, started upstairs and told him to go to hell, and he took the gun out of his pocket and it went off in his hand, accidentally. He was asked if he shot her intentionally, and he said, "No, the gun went off." He said nothing further of importance at this time.

The next morning he was arraigned on a charge of murder and an examination was waived. About an hour later, after he had been fully advised of the charge and warned that anything he might say could be used against him, and that whatever he said upon the subject must be voluntary, he was asked if he was willing to state what there was about the matter,

and he said he was. Thereupon he made a statement, which was taken down by two stenographers. He said in substance that he took the revolver intending to hunt woodchucks with it, but had never taken it before; that he went to the house to see Viola and to get his collar and necktie that he had left Saturday night; that when he entered the house Gayton and Viola came downstairs, and he told her that he wanted to talk with her, and asked her about "the wedding business;" that he was engaged to be married to her, and that he had the revolver in his hand and it went off; that he did not mean to shoot her, and went to pick her up, and did not know she was dead, and that he then went home to bid his sister good-by, and was going to kill himself.

During the course of his statement, which was quite long, he said, in answer to questions asked by the district attorney, that the revolver was in his inside left coat pocket with the butt down and the muzzle up, when he reached in with his right hand to put it in his right hip pocket so that she would not see it, as she did not want him to carry a revolver; that if he had buttoned his coat she could not have seen it; that on Saturday night she had agreed to go with him to hunt woodchucks, and he told her that he was going to take a revolver, and she said all right; that when she came downstairs with Gayton he asked her if she was going hunting with him, and she said she didn't feel well; that he then said, "Come on, Viola," and she asked what was in his pocket, and he went to take the revolver out and put it in the other pocket and it went off; that there was nothing in his breast pocket except the revolver; that he took hold of the middle of the weapon, and when making a motion to transfer it to his hip pocket it went off accidentally.

Upon the trial the defendant was sworn in his own behalf, and repeated much that he had stated to the district attorney.

He swore, however, that when he asked Viola if she was going after woodchucks with him, she said, "Yes, and told me to come out in the hall." He denied that he pulled her into the hall, or that she said she wanted nothing to do with him. She asked him if he had the revolver, and he said, "Yes," when she told him "to take it and put it in my hip pocket out of sight." He started to do so, and she turned around to get her hat, and as soon as he pulled the revolver out of his side pocket it went off by accident. He loved her, and did not intend to shoot her. He denied the statement of the chief of police, but said he told him "that the girl was dead, and he wanted to die with her." He also denied that after the shooting he pointed the revolver at Pierce.

On his cross-examination he said that Viola went into the hall first, and was about one foot ahead of him. When they were " in there about three feet and a half she asked me if I had the gun. . . . No, sir, she did not have her back toward me when she asked that. We were face together when she asked me that. She was still ahead of me, but she was facing me, when she asked me that. The first words she said was, ' Have you got the revolver.' I said, ' Yes.' We still stood there in the same position right close together. And when I said, ' Yes,' she told me take it and place it in my hip pocket. She was still ahead and nearer to the porch, just as we had gone in, only she had turned around, that is all the difference. We did not change our positions any, except that she turned around and faced me, and we were about a foot apart. And when she told me to put it in my hip pocket, I say, I reached in any took it out, and it went right off at the pocket as I was taking it out." When asked to put the revolver in his pocket with the butt down he did so and admitted that the top of the barrel was an inch below the top of the pocket. He repeated that " she still stood there facing me and ahead of me toward the porch when the revolver went off."

Seven witnesses of apparent standing and truthfulness who had known the defendant from five to eighteen years testified that his reputation was good and that he was sober, steady and industrious.

While the evidence as to the shooting was circumstantial, the case differs from most of those where the verdict rests upon circumstantial evidence, in that the parties to the homicide were under constant observation by several witnesses, except for a very few seconds when they were out of sight in the hall. Even during that short period, however, the right hand of Viola was in sight as it clasped the door casing, according to the testimony of those in the kitchen.

The case was clearly for the jury and this elaborate statement of the facts leave little room for argument. The main witnesses against the defendant were his own nephew and nieces and they were all friendly to him, although Florence Brooks had felt hard toward him some time before, but he apologized and they were friends again. So far as appears there was no inclination on the part of any witness to withhold, exaggerate or falsify. The jury were warranted in concluding that he was infatuated with Viola, that she had become tired of him and was trying to avoid him and, to use his own words, " had thrown him over," although the day fixed for their wedding was but four days off. He sought her on all occasions and was jealous of her. He armed himself with a revolver, went where she was, waited long to see her and shot her within five minutes after he came into her presence, and when he was so near her that the discharge set her clothing on fire. He shot her in the back, as was conclusively proved by the mute evidence of her dead body. This fact makes all his versions of the occurrence impossible. His defense has no support, except his own testimony, which is inconsistent with the established facts and full of contradictions. All the eye-wit-

nesses contradict him as to every essential particular. Although he had made no threat to kill, he had a motive for killing. While it is true that the shooting may have been accidental, for a self-cocking revolver may catch and go off without effort, all the circumstances are inconsistent with that theory, and it is clear that unless accidental, it was deliberate and premeditated. He swore that she asked him to go into the hall with her, and that she went in with him willingly, while the other witnesses testified that she spurned him, was trying to get away from him, had rushed for the stairs, and was unwilling, as she said, to have anything more to do with him. She had avoided him for weeks. On the day of the homicide she had concealed herself to keep away from him. When she finally met him she made every effort in her power to avoid him, and although nothing had occurred to change her mind, and while, according to the recollection of the other witnesses, she was grasping the door casing in the effort to get upstairs, he says that she asked him to go into the hall with her, and while they were standing in the hall, face to face, conversing pleasantly together, the revolver went off accidentally, yet it is conceded that the bullet entered her back. His version was obviously false. The version of the other witnesses was apparently true.

His conduct right after the shooting has a strong bearing on his intention. As the victim fell and Pierce started to help her, the defendant pointed the revolver at him and told him to stand back. He expressed no horror, sorrow or regret. If the occurrence was accidental, we do not see how he could have helped saying so on the spot, as instinct and nature would impel him to. He did not say it was an accident, nor act as if he had no intention to kill. All his actions pointed in the other direction. Several hours afterward, when he had had time to make up a story to save his life, he said it was accidental,

but in the meantime he had confessed to the chief of police that he shot Viola because she had promised to marry him and had gone back on him and he wanted to die and wanted her to die with him.

We will not further review the facts, for it is obvious that the verdict of the jury is supported by the evidence and that the judgment should be affirmed unless some error of law requires a new trial.

Upon the subject of deliberation and premeditation the court charged elaborately, and among other things said: " Murder is premeditated when the killing is done after the idea to kill is formed—after the intent to kill is formed— after the design is thought over and revolved in the mind and meditated upon. . . . Deliberation is forethought or intention as distinguished from a sudden impulse. It is the making of a choice of action; to deliberate; to take time; to think just what you will do and then do it; to execute your choice, to execute your thought, to make a choice of action. . . . A rash or sudden impulse is not a deliberate intent. Deliberation is the exercise of forthought in the formation of an intention. If the killing is not the instant effect of impulse, if there is any hesitation or doubt to overcome, a choice made as the result of thought, however short the mental thought, the struggle of the mind, it is sufficient to characterize the crime as being deliberate. If there is an opportunity for a choice, if there is the exercise of a choice between doing a thing and not doing it—if that opportunity exists and the choice is made—if I have an opportunity of saying whether I will do this or I will not and I make up my mind to do it, that is deliberation sufficient within the law to apply the term as characterizing this offense."

The defendant's counsel excepted to the last two sentences quoted above and insists that the instruction was erroneous be-

cause of the expression, "however short the mental thought." We do not think the expression is fortunate, for standing alone it would tend to mislead, but it has been sanctioned for many years and sometimes when not so carefully qualified as in the charge under review. Thus more than a quarter of a century ago Judge DANFORTH said with the approval of all the judges: "If, therefore, the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder. (*Leighton v. People,* 88 N. Y. 117, 120.)

A year later Judge EARL expressed the views of all the judges upon the subject in the following words: "Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is." (*People v. Majone,* 91 N. Y. 211, 212.)

In *People v. Conroy* (97 N. Y. 62, 76), Chief Judge RUGER, speaking for all the judges but one, who concurred in the result, quoted with approval what we have quoted above and these cases have been uniformly followed since and frequently by making the same quotations. (*People v. Johnson,* 139 N. Y. 358, 361; *People v. Ferrano,* 161 N. Y. 365, 376, 15 N. Y. Crim. 60; *People v. Breen,* 181 N. Y. 493, 500, 19 N. Y. Crim. 389.)

In all these cases and in many others to the same effect which might be cited, as well as in the case at bar, the expression "however short," or its equivalent, is not used alone but is equalified by what must be done during the

period thus described. While the time for reflection is not measured in minutes or seconds it is measured by facts. The time must be long enough to make a choice, as the result of thought and reflection, and to act upon the choice thus made. It is obviously impossible to measure this period by the ordinary method of measuring time and, hence, it is necessary to measure it by what must be done in order to satisfy the statute which requires a deliberate and premeditated design. (Code Crim. Pro., § 183; Penal Law, § 1044.) This was done on the trial under review with unusual care, more than seven pages of printed record being devoted to the subject.

Among other things the trial judge said: " If the defendant in this case shot the revolver in a sudden passion excited by what the deceased had then said to him—that she did not want anything to do with him, would not have anything more to do with him and that she turned him down and repulsed his advances, and by her treatment of the defendant at that time, for an instant—for a moment—while he was standing in the hallway, disturbed his reasoning power, his reasoning faculties, and deprived him of the capacity to reflect, or while he was under the influence of some sudden and uncontrolled emotion caused or brought about by the final repulse of this girl or the final refusal of the girl to have nothing more to do with him, and if that was of such a nature as to deprive him of his power to form an intent and deprive him of his mental power to premeditate and deliberate, and he did not have an intent to kill, and did not premeditate and deliberate upon it, then he cannot be convicted of murder in the first degree."

We think that the exception under discussion raised no reversible error.

The court charged with equal elaboration upon the question of good character and among other things said: " In this case the defendant has offered direct evidence that he has a good

character. . . . It is the law that evidence of good char-
acter may of itself create a reasonable doubt when without
it none would exist. It is for you as jurors to say what weight
the evidence relating to the character of the defendant should
be given in determining the question of his guilt of the crime
charged, or of any lesser degree or of any lesser crime. No
matter how conclusive the testimony may be the law is that
the character of the accused may be such as to create a doubt
in view of the improbability that a person of such character
would be guilty of the offense charged and that the other evi-
dence that is being urged against him is false or the witnesses
who stated those facts are mistaken. It is for you to say,
in view of what the seven witnesses from Olean have said
about the defendant's character, whether that evidence as to
his character leads you to a reasonable doubt as to the truth
of the testimony that is claimed to have established that the
defendant is guilty beyond a reasonable doubt. If you are
satisfied beyond a reasonable doubt of the defendant's guilt,
evidence of the defendant's good character is of no importance
whatever. Evidence of good character is not a defense for a
guilty man. It is only to be considered by the jurors in reach-
ing a conclusion as to his guilt. After you have reached a
conclusion beyond a reasonable doubt as to the guilt of a per-
son, the question of character cannot be of any importance,
but in investigating the case, analyzing the evidence, resolving
doubts as to the various facts and circumstances that have been
established, putting the items of evidence and the facts that
are claimed to exist in their proper place, you are bound as
jurors to consider the character of the accused and give it
such weight as you as jurors deem proper under the law as
I have given it to you, and in disposing of all questions which
are required to be proved by the people to your satisfaction
beyond a reasonable doubt."

32

At the close of the charge the counsel for the defendant excepted to what he claimed the court had charged in these words: "If you are satisfied of the defendant's guilt, evidence of good character is of no importance." The court thereupon remarked: "In that connection I told them that they were to consider the evidence of good character in arriving at a conclusion as to whether he was guilty or not." The learned counsel then said: "I desire also to except to that part of the charge in which you say, 'After reaching the conclusion that he is guilty, then evidence of good character is of no account.'" The court at once said: "I make the same observation as to that. It is to be considered upon the question of reaching a conclusion as to whether he is guilty or not."

The defendant claims that the jury were thus told in effect to use evidence of good character only as a side light, in which to analyze the facts and circumstances, and that they were to decide the question of guilt upon the other evidence in the case. This position is unsound, for the jury were instructed to consider the evidence of good character with all the other evidence in arriving at a conclusion; to weigh the probabilities as to whether a person of such character would be guilty of such an offense; that good character alone might create a reasonable doubt, and that if they had a reasonable doubt the defendant was entitled to an acquittal. They were told in effect that good character was not a specific defense, such as justification or excuse might be, but, as it might create a reasonable doubt, even if the evidence were otherwise conclusive, the jury should consider it with all the other evidence in order to decide whether the defendant was guilty beyond a reasonable doubt. While the detached portions excepted to, standing alone, might have been erroneous, when read with the context, as the law requires, there was no reversible error.

The other rulings made during the trial, whether excepted

to or not, have been duly examined, but they require no expression of consideration.

The defendant filed a demurrer to the indictment upon the ground that the facts stated do not constitute a crime. The objection relied upon is that it does not appear on the face of the indictment that Viola Hughes was "a human being." The general charge in the indictment is the crime of murder in the first degree, and, after specifying the time and place, the means used and other particulars in the usual way, it is alleged that the defendant did thus kill and murder Viola Hughes feloniously and with malice aforethought.

The use of the word "murder" implies that a rational being is the subject of the crime, and the use of an ordinary given name and surname raises the presumption that a human being is meant. (*Palmer v. People*, 138 Ill. 356, 362; *State v. Stanley*, 33 Iowa, 526, 530; *Merrick v. State*, 63 Ind. 328; *Bowers v. State*, 122 Wis. 163, 165; *Perryman v. State*, 36 Tex. 321; *State v. McNulty*, 93 Cal. 427; *People v. Lee Look*, 137 Cal. 590, 592; *State v. Day*, 4 Wash. 108.) The word "feloniously," in connection with the other allegations, carries a like implication. While the statute uses the words "human being" in defining the crime of murder, whether the subject of the alleged crime was a human being or not is a matter of proof rather than pleading. (*Wade v. State*, 23 Tex. App. 308.) In *People v. Freeland* (6 Cal. 96) the defendant was indicted "for the crime of murder in shooting one Greek George"; in *Reed v. State* (16 Ark. 499) "for the murder of a certain Wyandotte Indian, the name being unknown"; in *Wade v. State* (23 Tex. App. 308) for the murder of "Smutty, My Darling," yet the indictments were all held sufficient, although there was no other description of the subject of the homicide.

If this indictment is bad for the reason assigned, scarcely

any indictment in modern times is good. While a few very ancient forms sanction the use of the words, the omission of which is claimed to be error, no authority, ancient or modern, which has been called to our attention or that we have been able to find, requires this formality. For many years past the forms set forth in the works of practice and in general use throughout the country have not even suggested them. (1 Whart. Prac. 114, 185; Whart. on Homicide [3rd Ed.], § 569; Archbold Pleading & Evidence [21st Ed.], 712; 9 Am. & Eng. Encyc. of Law, 638; 10 Encyc. Pl. & Pr. 145.)

The objection is purely technical, and technical objections are no longer regarded as serious unless they are so thoroughly supported by authority that they cannot well be disregarded, even under the latitude of the statute relating to the subject. The criminal law is fast outgrowing those technicalities which grew up when the punishment for crime was so severe as in many cases to shock the moral sense of lawyers, judges and the public generally. When stealing a handkerchief worth one shilling was punished by death, and there were nearly two hundred different capital offenses, it was to the credit of humanity that technicalities should be invoked in order to prevent the cruelty of a strict and literal enforcement of the law. Those times have passed, for the criminal law is no longer harsh or inhumane, and it is fortunate for the safety of life and property that technicalities, to a great extent, have lost their hold. We overrule the contention of the defendant in regard to the indictment, because it is founded on a technicality, with no support in authority and with but slight support in reason.

The defendant had a fair trial, with the rulings upon all doubtful questions in his favor. The charge was able, full and impartial. Great care was taken to protect his rights and to see that the jury clearly understood the issues they were to

decide and the grave responsibility resting upon them. We see no reason to disturb their verdict, and the judgment and orders appealed from should, therefore, be affirmed.

CULLEN, Ch. J., GRAY, WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.