THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v OSCAR McCULLOUGH, Appellant.

First Department, March 20, 1980

### APPEARANCES OF COUNSEL

*Elizabeth M. Fink (Polly Eustis* of counsel with her on the brief), attorney for appellant.

*Robert M. Pitler* of counsel *(Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

At about noon on November 10, 1976 Raymond Outlaw, Jr., was shot six times as he descended the stoop of his apartment house at 628 West 147th Street. An upstairs tenant whose curiosity was aroused by the sound of a "firecracker" peeked through the venetian blinds on the window facing the street and observed the back view of a male with a low-cut afro hair style, wearing a short, light brown leather jacket, fleeing west on 147th Street. She also recognized the stricken Outlaw, supine, struggling to drag himself towards the steps leading down to a street-level apartment entrance.

After several minutes, Outlaw's landlady, Mrs. Miller, who had heard the shots, went outside to investigate. She found Outlaw tossing and turning, at the bottom of the front steps, with blood "pumping" from his stomach. Mrs. Miller ran back to her apartment and brought out a blanket which she placed over the victim. She did not speak to Outlaw at this time but, instead, went back to her apartment to call the police. When she returned, after a lapse of time estimated as 10 minutes since the shooting, she asked Outlaw: "My God, who shot you?" He answered "Na." Mrs. Miller said "Who?" Outlaw repeated "Na." Having heard the name before, Mrs. Miller responded "That's your friend." Outlaw replied "Yes, ma'am." Mrs. Miller then asked, "Why did he shoot you?" Outlaw answered "I was coming out of the building." He did not speak any further to Mrs. Miller.

When the police arrived at about 12:10 P.M., they found

Outlaw coherent but "in a pretty bloody state." He was taken immediately in a police vehicle to a hospital, where he died later that day. An autopsy revealed six bullet wounds, the first shot having been fired into the victim's back from close range, hitting a kidney, the liver and the stomach before exiting from the victim's chest. The cause of death was certified as bullet wounds of the back, kidney, liver, stomach and extremities.

At defendant's trial for Outlaw's murder the conversation between Mrs. Miller and Outlaw was admitted, over objection, on the ground that Outlaw's statements qualified as a spontaneous declaration. To link Oscar McCullough, the defendant, to "Na", the People introduced an address book found in Outlaw's apartment.[1] The book contained 95-boxed entries, three of which, according to the testimony, were under the name "Na" or "Nay." One entry listed a telephone number which was shown to belong to defendant's girlfriend, while a second listed the home telephone number of defendant's mother. The third entry contained two telephone numbers, one of which belonged to defendant's mother; the second was traced to one Dominga Rivera in Brooklyn.

Outlaw's mother testified that defendant was the only friend of her son known as "Na." Defendant, whose defense was alibi, testified that he knew of three acquaintances of Outlaw in the neighborhood who were named "Na." But he did acknowledge that he was known as "Na" and that he had been Outlaw's longtime friend, often having purchased marihuana from him.[2] He himself had once lived on West 147th Street.

Defendant was convicted of murder in the second degree. Of the issues raised on appeal only two concern us: the admissibility of Outlaw's conversation with Mrs. Miller, and the court's supplemental instruction to the jury concerning its discovery during deliberations of a hitherto unexplained entry in Outlaw's address book under the name "Na". The telephone number next to the entry did not correspond to any of the other "Na" telephone numbers which were linked either directly or indirectly to defendant during the trial.

1. A search of Outlaw's apartment had been conducted by police officers immediately after the shooting.

2. The same search of Outlaw's apartment which produced the telephone book also uncovered four pounds of marihuana manila envelopes, scales and $11,700 in bills. In fact, before his demise Outlaw was charged with drug violations.

■ In urging error in the admission of Outlaw's statements, defendant argues that the lapse of time and the content of the victim's remarks demonstrate that these statements came after the shock of the shooting had subsided and at a time when the victim's reflective powers dominated. Thus, defendant argues, the factual bases for the admission of these statements as a spontaneous declaration were absent. While the issue is close, we think the statements were properly admitted.

Spontaneous declarations are admissible if they are "declaratory of the circumstances of an injury when uttered by the injured person immediately after the injury; provided that [they] be spontaneously expressive of the injured person's observation of the effects of a startling occurrence, and the utterance is made within such limit of time as presumably to preclude fabrication." *(People v Del Vermo,* 192 NY 470, 483.)

Recognized as an exception to the hearsay rule, the spontaneous declaration is often confused with a statement which is admissible because it is part of the *res gestae.* (See *Patterson v Hochster,* 38 App Div 398, 401; also *People v Del Vermo, supra,* p 487; *People v Caviness,* 38 NY2d 227, 230.) A statement is part of the *res gestae* when it is part of the transaction itself which is sought to be proved, or when it tends to qualify, explain or characterize the acts which it accompanies (see, e.g., *Waterman v Whitney,* 11 NY 157, involving a testator's declarations made contemporaneously with the destruction of his will). A declaration admitted under this principle is not, strictly speaking, offered or received for its truth and is, therefore, nonhearsay. (Richardson, Evidence, 10th ed, § 280.) But a declaration made at the time of a transaction, relating solely to the acts and conduct of others and not in any way qualifying or explaining the act of the person speaking is, technically, hearsay, as it is offered for its truth. Declarations made by a participant during or after an injury or other startling event, but declaratory of the circumstances, are within the latter category. Such statements are admissible provided they were uttered spontaneously. *(People v Del Vermo, supra,* p 483; *Scheir v Quirin,* 77 App Div 624, affd 177 NY 568; 6 Wigmore, Evidence, §§ 1745, 1747.)

In 1975 the Court of Appeals extended the spontaneous declaration exception to include not only spontaneous declarations of a participant but also those of a nonparticipant, such as a bystander. *(People v Caviness, supra.)* Furthermore, if the

declaration is truly spontaneous, its admissibility is not precluded merely because the declaration was made in response to a question (see *People v Del Vermo,* 192 NY 470, *supra),* but, instead, should depend on a variety of circumstances, of which the posing of the question is only one.

The touchstone of the admissibility of the excited utterance or spontaneous declaration is its reliability. "What the law altogether distrusts is not after-speech but after-thought." *(Travelers Ins. Co. v Sheppard,* 85 Ga 751, 775-776.) In one of its most recent decisions on the subject, the Court of Appeals held that the statement's admissibility turns on an assessment of the nature of the startling event, the lapse of time between the event and the statement, and the activities of the declarant during this interval. *(People v Edwards,* 47 NY2d 493, 497.) The court noted: "Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection." *(Id.,* at p 497.)

In this case defendant, while relying heavily on the time lapse of 10 minutes, has ignored completely the victim's physical condition and capacity. He had been shot six times, at close range, and, bleeding profusely, was unable to drag himself down the steps to the street-level apartment entrance.[3] In such a setting, where the span of 10 minutes is virtually meaningless, time is "not measured in minutes or seconds it is measured by facts." *(People v Gilbert,* 199 NY 10, 24.) Realistically viewed, the trauma produced by the shooting was as acute 10 minutes after the shooting as it was in the first moments. Medically unattended and helpless, the victim was still laboring under the "stress of nervous excitement resulting from an injury". *(People v Caviness,* 38 NY2d 227, 230, *supra.)*

*People v Marks* (6 NY2d 67, cert den 362 US 912), upon which defendant relies, is factually distinguishable. There, the victim's remarks exculpating the defendant were held inadmissible because the victim was able to walk a distance of 200 feet, during which he climbed over a ledge and mounted several steps. (See, also, *People v Sprague,* 217 NY 373.) Moreover, the victim in *Marks,* a drug addict who had recently stolen drugs from the defendant and was fearful of

---

3. The ruling to admit Outlaw's statements as a spontaneous declaration was made before trial. Thus, no effort was made at trial to qualify the statements as a dying declaration. For that matter, no such effort was made at the time of the ruling either.

reprisal, had a motive to lie. The court thus found that the victim's statements were not uttered while the "stress of nervous excitement * * * [stilled] the reflective faculties and [removed] their control." (Id., at p 71, citing Wigmore, Evidence, § 1747, subd [I].)

Defendant also argues that Outlaw's "unresponsive" reply to Mrs. Miller's question as to why "Na" shot him was clearly the product of reflection which rendered the entire statement inadmissible. Rather than evincing a lack of spontaneity, the never-completed answer "I was coming out of the building", indicates, if anything, either an impaired ability to formulate a coherent answer due to the pain and shock from the shooting or an ignorance, with faculties intact, of what had precipitated the incident. We do not interpret Outlaw's answer as a deliberate attempt to evade the question, as defendant suggests. Nor does the evidence itself suggest, as in Marks (supra) that the victim had a reason to lie.

In our view, the totality of the surrounding circumstances demonstrates that Outlaw's responses "sprang instinctively from the stress and excitement caused by the shooting and followed so closely after the event as to preclude opportunity for deliberation, fabrication or design". (People v O'Neall, 47 NY2d 952, 954.) Accordingly, we do not find error in admitting Outlaw's statements in evidence.

Of more serious concern, however, is the trial court's final response to the jury's question as to the legal significance of a fourth entry in Outlaw's address book under "Na" or "Nay" and the telephone number listed thereunder. This number did not bear any connection to the other telephone numbers listed under "Na" or "Nay" for all of which the People had accounted. Detective Rochford, through whose testimony the address book was placed in evidence, testified that he had examined the book and that the name "Na" or "Nay" appeared three times. During jury deliberations, the jury found another entry under "Na" with a telephone number which was never discussed during the trial.

Approximately four hours after deliberations began the jury returned to the courtroom and inquired about the number of "Nas" in the phone book:

"THE COURT: The question that we've been wondering about, ladies and gentlemen, number 3: More NA's in the phone book. I think I did tell you that the address book is in

evidence, and you may look through it. The address book is in evidence.

"THE FOREMAN: We found a telephone number—

"THE COURT: Whatever is in there is in evidence. All right.

"Anything else?

"JUROR NO. 7: Possibly verify any of those numbers?

"THE COURT: No. If you wish to write a question, we will read to you all the testimony relating to the various telephone numbers.

"May I see you gentlemen?"

(Discussion off the record at the side bar of the bench, after which the following occurred in open court:)

"THE COURT: If there is anything you wish about certain numbers, you may ask if there is or there is not any testimony as to any numbers that are in evidence. I don't know if there is testimony or isn't. But if you wish any, find out if there's any testimony about any numbers in evidence, you may do so, and we'll look for it and give it to you. All right."

Almost one hour later the jury returned to ask:

"THE COURT: All right. I have, ladies and gentlemen, your note, which has been exhibited to counsel, reading as follows:

"Is there any testimony on NA, 690-2701? And the answer to that is no. All right."

Later that evening the following ensued:

"THE COURT: All right, ladies and gentlemen. I have here your request, which has been exhibited to both counsel. As to the first part, if one concluded that the crime was performed by one of only two possible persons and one of them is the defendant, and no evidence was presented with regard to the other person, would a reasonable doubt exist with regard to the defendant?

"As I told you, ladies and gentlemen, the People always have the burden of proving beyond a reasonable doubt that it was this defendant, Oscar NA McCullough, who committed the crime.

"If you have concluded that the crime was committed by one of two persons, of whom one could be the defendant, then that would not be sufficient. * * *

(Discussion off the record at the side bar of the bench, after which the following took place in open court:)

"THE COURT: As I said, so that the matter be perfectly clear as to your first question:

"Again, if you conclude that the crime was performed by only one of two persons and one of them is the defendant, that would not be sufficient. What I meant when I said would not be sufficient is that it would not be sufficient to convict this defendant, Oscar McCullough, of being guilty beyond a reasonable doubt, which is your duty to decide, whether he has been proven guilty beyond a reasonable doubt.

"All right, counsellor?

"DEFENDANT'S ATTORNEY: Yes, your Honor. Thank you."

Deliberations resumed the next morning, and the jury returned to the courtroom with further questions just after noon:

"THE COURT: Your first question:

"If there is no testimony on name NA, telephone number 690-2701 found in the address book, the only thing we know is this name and telephone, how should this be weighed in considering the total testimony and evidence?

"This evidence or lack of evidence must be weighed just like all the other evidence in the case and under the same criteria.

"And I remind you, it is still the People's burden to prove the defendant guilty beyond a reasonable doubt.

"Now, as to your third question:

"*Does the law require that all possible or reasonable perpetrators of the crime be ruled out before considering testimony and evidence relating to the guilt or innocence of the defendant?*

"*The answer to that is no. Sometimes there is one perpetrator to a crime, sometimes there are multiple perpetrators, sometimes there is one suspect, sometimes there are multiple suspects. You must look at the evidence as it stands in this case and as it relates to this defendant who is the only person on trial before you.* [Emphasis added.]

"Does that help you, ladies and gentlemen, or at least help you as much as I can help you? I cannot do your job for you.

"Now we've the second question, which is:

"We would like to hear all of the testimony with regard to the telephone address book by police and detectives.

"All of the testimony is by Detective Rochford. There is one

very brief page by Detective Sweeney on the finding of the address book. Do you want that too? No.

"Read Detective Rochford's testimony."

Detective Rochford's testimony was read by the reporter and the jury then returned to its deliberations.

One-half hour later the jury reported a deadlock, whereupon the court gave a further charge directing the jurors to resume deliberations and exhorting them to endeavor to break their impasse. No objection was taken. As part of that instruction the court stated: "In my experience as a Judge, I've frequently known that one of the causes for people not being able to work things out is that irrelevancies creep in."

An hour and one half later the jury returned with its verdict.

■ In our opinion the cumulative effect of the court's instruction on the day of the verdict compels a reversal. It is apparent that at least one juror was concerned about the unexplained existence of another "Na" in Outlaw's address book. Defendant had himself testified that Outlaw had three other acquaintances in the neighborhood known as "Na."

The jury's question about whether they had to exclude all other possible or reasonable perpetrators before considering the case against defendant was essentially the same question as it had asked on the first day of its deliberations. The court's initial answers to the jury's inquiries on this subject were proper. It had told the jurors, in effect, that if they found that the crime was committed by one of two persons, one of whom could be defendant, the evidence would be insufficient to convict. But its final instruction just hours before the verdict completely vitiated the earlier charge. Obviously, as a matter of abstract logic, every possible perpetrator of a crime need not, but more importantly, cannot, be eliminated *before* a jury considers the evidence against a defendant. The process of assessing guilt cannot be bifurcated into, first, a threshold elimination, dehors the record, of all perpetrators, and then a consideration of the evidence as it bears on the defendant's guilt. In order to exclude any other reasonable perpetrator the jury must, of necessity, consider the evidence, or, of course, lack of evidence, against a defendant. The jury should have been informed, as it had been the day before, that if it did not eliminate all reasonable suspects *after* considering the evidence, then the evidence would be insufficient to convict.

Whether a simple negative answer would have sufficed in response to the jury's question on the last day regarding the exclusion of other suspects is now academic. The court told the jury "Sometimes there is one perpetrator to a crime, sometimes there are multiple perpetrators, sometimes there is one suspect, sometimes there are multiple suspects. You must look at the evidence as it stands in this case and as it relates to this defendant who is the only person on trial before you." The evidence did not give rise to any suggestion of a second perpetrator, whereas evidence did exist of at least three other "Nas". In fact, a "Na" for whom the People had not accounted appeared in the victim's own address book. Unlike the numbers listed under the other three "Nas" in the book, his telephone number was not connected to defendant. At least one juror was troubled by this piece of unexplained evidence, which could well have been the basis of a reasonable doubt, as the court had recognized the day before. When the court coupled "multiple perpetrators" with "multiple suspects", and then referred to "this defendant who is the only person on trial before you", the effect was to diminish the People's burden by removing from the province of the jury the question of whether the fourth "Na" could reasonably be perceived as the perpetrator. The statement would, of necessity, have had an especially devastating effect on any juror attempting to reconcile the existence in Outlaw's address book of another "Na", for whom no one could account, with the proof against defendant, the only "Na" on trial.

Just one-half hour later, when it reported an impasse, the jury received a further instruction which included the remark: "[i]n my experience as a Judge, I've frequently known that one of the causes for people not being able to work things out is that irrelevancies creep in." While seemingly innocuous and perhaps acceptable in other cases as a general principle, this instruction was, in these circumstances, equally prejudicial and only compounded the earlier error. Its unfortunate effect would be to disabuse any juror of a lingering notion that the unexplained "Na" in the victim's address book could be the basis of a reasonable doubt.

As already noted, no exception was taken to these portions of the charge and ordinarily the errors would not be preserved for review. (See CPL 470.05, subd 2.) We are of the view, however, that these errors so fundamentally affected the fairness of the proceeding that no exception was required. (See

*People v McLucas,* 15 NY2d 167, 172; *People v Patterson,* 39 NY2d 288, affd 432 US 197.)

Accordingly, the judgment, Supreme Court, New York County (LEVITTAN, J.), rendered December 15, 1977, convicting defendant of murder in the second degree and sentencing him to 15 years to life, should be reversed, on the law, and the matter remanded for a new trial.

SILVERMAN, J. (dissenting). We would affirm the judgment appealed from.

On the day before the verdict the court clearly instructed the jury in response to the jury's question that, if the jury concluded that the crime was performed by one of two persons, one of whom could be the defendant, that was not sufficient to convict the defendant; that the guilt of this defendant (later referred to as "the only person on trial before you") must be proved beyond a reasonable doubt. This charge was explicitly stated to be acceptable to defendant's attorney. In the circumstances, we think the majority is giving a tortured and unnatural interpretation to what is at worst a slightly ambiguous phrase or two in the court's later instruction. "A charge may be a sufficient and even a substantially correct instruction even though it contains phrases which, isolated from their context, seem erroneous. The test is always whether the jury, hearing the whole charge, would gather from its language the correct rules which should be applied in arriving at decision." *(People v Russell,* 266 NY 147, 153.) The question of the effect of the appearance of possibly another "Na" in the address book had previously arisen and been dealt with by the court's instruction satisfactorily to the defendant's attorney. Thus defendant's attorney was alerted to this issue. The failure of the defendant's attorney to object to the later instruction, now found erroneous by the majority, is extremely persuasive that nobody who heard the later slightly ambiguous instruction thought that it in any way contradicted or vitiated the earlier clear and correct instruction. "[C]onvictions are not to be set aside because, on reflection in tranquility, better charges could have been composed." *(People v Yanik,* 43 NY2d 97, 100.)

LUPIANO and BLOOM, JJ., concur with SULLIVAN, J.; KUPFERMAN, J. P., and SILVERMAN, J., dissent in an opinion by SILVERMAN, J.

Judgment, Supreme Court, New York County, rendered on

December 15, 1977, reversed, on the law, and the matter remanded for a new trial.