■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v

ISRAEL RODRIGUEZ, Appellant.—Judgment, Supreme Court, Bronx County (William H. Wallace, III, J., at hearing, trial and sentence), rendered September 11, 1986, which, after a jury trial, convicted defendant of the crime of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]), and sentenced him, as a second felony offender, to an indeterminate prison term of from 2½ to 5 years, is unanimously reversed, on the law, on the facts, and, as a matter of discretion in the interest of justice, judgment vacated, and the matter remanded for a new trial.

By indictment number 1487, filed March 27, 1986, a Bronx County Grand Jury charged, in a two-count indictment, that defendant, on March 22, 1986, committed the crimes of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]) and resisting arrest (Penal Law § 205.30).

Subsequent to indictment, defendant moved to suppress physical evidence and incriminating statements. Thereafter, a combined *Mapp (Mapp v Ohio,* 367 US 643 [1961]) and *Huntley (People v Huntley,* 15 NY2d 72 [1965]) hearing was held.

Our review of the transcript of that hearing indicates the People called the only witnesses, who were New York City Police Officers Brian Ahearn (Officer Ahearn) and Peter Quinn (Officer Quinn). The defendant, who was represented by counsel, presented no evidence.

In summary, the officers testified as follows:

On March 22, 1986, at approximately 1:30 P.M., the officers were on radio motor patrol, in the vicinity of Webster Avenue and Claremont Parkway, in Bronx County, when they were flagged down by an unidentified male Hispanic, who stated that he had just been robbed at gunpoint, and the robber "was up the block on the next corner". The victim provided the officers with a description, such as that the robber was wearing a black jacket, white T-shirt, and black pants. Prior to proceeding up Webster Avenue to investigate, the officers told the victim to wait for their return.

Thereafter the officers observed the defendant, who fit the description given by the victim, walking south on Webster Avenue. At that point, the officers pulled over and exited their vehicle. They called to defendant. In response, defendant "turned around [and said] '[t]he guy that you [the officers] were looking for was around the corner' ". When the officers asked the defendant to come over to the radio car, he fled south on Webster Avenue, with the officers, on foot, in pursuit.

In pertinent part, Officer Ahearn testified "At that point with his [defendant's] right hand he reached into his left jacket [pocket] and pulled out a revolver * * * [M]y partner [Officer Quinn] was on the sidewalk [and] I was on the street * * * [defendant] went behind [a] blue van and a parked car in that area. I lost sight of him at that moment. He emerged on the other side without the gun in his hand". Officer Quinn followed defendant behind the van, and, "observed [the defendant] place a gun under a car to his right and money and [glassine envelopes] in his left hand under the van to his left * * * I told him he was under arrest". Subsequently, after a short scuffle, the officers handcuffed defendant and recovered the subject gun, money, and glassine envelopes, mentioned *supra.*

When defendant was frisked, the officers found that he was wearing a shoulder holster on the left side of his body.

Soon after the officers placed defendant inside the radio car, they tried to find the victim, but he had disappeared from the location where the officers had told him to wait.

The officers now drove the defendant to the 48th Precinct for processing. At that precinct, Officer Ahearn administered *Miranda* warnings to defendant. Thereafter, according to Officer Ahearn's testimony, while he was seated beside a holding cell containing defendant, and completing the paperwork in connection with the arrest, defendant, without prompting, exclaimed " 'I robbed him [and] I am going to do it again' * * * [Sometime] after that, he [defendant] said that he took the gun from someone else".

Since the hearing court found the officers' testimony credible, that probable cause supported the officers' actions, and defendant's admissions were made spontaneously, it denied defendant's suppression motion in its entirety.

A jury trial commenced on July 10, 1986.

The People's case against defendant consisted of the testimony of Officers Ahearn and Quinn, who testified substantially as they had at the hearing, and the testimony of a police ballistics expert, who testified that the .38 caliber revolver, mentioned *supra,* which had been admitted into evidence, was operable. Also received into evidence was the shoulder holster, mentioned *supra.*

On both direct and cross-examination, Officer Quinn, who had been qualified as a police fingerprint technician, testified that no fingerprints had been found on the revolver, mentioned *supra.*

When the People rested, the defendant put in a defense, which consisted of his own testimony. In substance, defendant, who was 29, testified he fled from the officers, since he feared that they would find three glassine envelopes of drugs he had in his jacket, and, as the officers chased him, he ducked behind a parked car, and discarded these glassine envelopes, as well as some money. Specifically, defendant denied he was carrying a gun, wearing a shoulder holster, or that he placed a gun under a car.

During his summation, defense counsel stressed that, since no fingerprints were found on the recovered weapon, the officers could have been mistaken in claiming defendant had possession of a handgun.

Subsequent to receiving the court's charge, the jury deliberated for approximately a day and one half before reaching a verdict, which found defendant guilty of the weapons possession count and acquitted him of the resisting arrest count.

In the course of their deliberations, the jury sent numerous notes to the court, and the court responded with, *inter alia,* a supplemental charge.

Our review of the record indicates that a key part of the defense strategy was to contend that the fact no fingerprints had been found on the gun corroborated defendant's testimony that he never possessed it. Nevertheless, the trial court repeatedly instructed the jury in its supplemental charge that "Fingerprints have nothing to do with the issues in this case" and the jury should "Forget the fingerprints, because that's not what we are talking about here". We find that the trial court committed reversible error, when it instructed "the jury * * * [to] ignore [defendant's fingerprint defense]" *(People v Williams,* 62 NY2d 765, 767 [1984]), since such instruction denied the defendant a fair trial, in that it eliminated from the jury's consideration an essential element of the defense. In other words, "the trial court all but told the jury not to consider [that] evidence" *(People v Baker,* 44 AD2d 83, 84 [1974]).

Moreover, we find that the trial court committed a further error in the supplemental charge, when it delivered an unbalanced and a coercive *Allen (Allen v United States,* 164 US 492 [1896])* charge. Our examination of the record indicates that the trial court delivered its *Allen* charge in response to a jury note, which informed the court that the jury was "not talking to each other". While in part of its *Allen* charge the trial court correctly advised the jury to continue to deliberate,

attempt to reconcile their views, and that they should not hesitate to change their position, it erroneously failed to balance those instructions with language that would indicate "the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows" *(Allen v United States, supra,* at 501). In conclusion, this "imbalance in the court's supplemental charge * * * may have had a coercive effect upon the jury" *(People v Robinson,* 84 AD2d 732, 733 [1st Dept 1981]).

Since defense counsel did not interpose specific objections to the trial court errors, discussed *supra,* concerning the supplemental charge, these errors have not been properly preserved for our review (CPL 470.05 [2]). However, we find these errors so egregious that we reverse the conviction, in the interest of justice and remand for a new trial *(see, People v Maschi,* 76 AD2d 808 [1st Dept 1980]).

After examining the defendant's contention that the hearing court erred in denying the suppression motion, discussed *supra,* we find that contention, on the basis of the record, to be without merit. Concur—Ross, J. P., Carro, Rosenberger, Wallach and Smith, JJ.