THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CARL WATKINS, Appellant.

First Department, May 29, 1990

302

## APPEARANCES OF COUNSEL

*James M. McGuire* of counsel *(Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Miriam J. Hibel* of counsel *(Philip L. Weinstein,* attorney), for appellant.

## OPINION OF THE COURT

SULLIVAN, J. P.

At issue are a series of trial court determinations, each of which, it is argued, deprived defendant of a fair trial.

Defendant's conviction arises out of a midafternoon, December 15, 1987 "buy and bust" operation conducted by members of the New York City Police Department's Manhattan Special Anti-Crack Unit. Undercover Officer Edwin La Torres approached defendant and Kevin Lloyd,* who were standing together on the sidewalk on Second Avenue between 123rd and 124th Streets, and asked defendant for crack. Before defendant could respond, Lloyd asked the officer how many vials he wanted. La Torres responded "four nickels", and Lloyd shook his head indicating "yes". Lloyd then reached into his jacket pocket, removed several vials and handed them to defendant, who said to La Torres, "let's take a walk." The two separated from Lloyd and walked a few steps when defendant showed the undercover officer four pink-capped crack vials. After looking them over, La Torres took the vials and handed defendant a prerecorded $20 bill. Meanwhile, from her vantage point about one-half block away, Officer Sheila Almond, acting as the "ghost", saw an "exchange" between defendant and Lloyd and a subsequent "exchange" between defendant and La Torres. Almond, however, could not see what was exchanged during either transaction. The sale, from the time negotiations began to its consummation, took 2½ minutes.

As soon as he received the four vials of crack, La Torres signaled Almond that the transaction had been completed. After entering a car driven by another undercover officer, who was waiting for him on 122nd Street, La Torres also alerted his backup team, by radio, giving a description of the two

---

* Lloyd pleaded guilty to an attempt to commit the crime of criminal sale of a controlled substance in the third degree and was sentenced to an indeterminate term of from 2 to 6 years.

sellers. When Officer Almond, who had entered a store to contact the backup team by radio, returned to the street, she observed defendant going into another store on Second Avenue, closer to 124th Street. Within minutes of the transaction, defendant and Lloyd were seized at the scene of the sale by the backup team and the "ghost" officer. A search of Lloyd uncovered $68 and two pink-capped vials of crack. Neither the prerecorded buy money nor any contraband was found on defendant. Officer La Torres returned to the scene some 4 or 5 minutes after the sale and, using the police car radio, confirmed that the two men being detained were the sellers. At trial, police department chemists testified that, upon analysis, each of the four pink-capped vials sold to Officer La Torres and the two pink-capped vials recovered from Lloyd contained cocaine. Defendant was convicted of both criminal sale and possession of a controlled substance in the third degree.

■ On appeal, defendant argues, *inter alia,* that the trial court's biased response to the jury's question concerning the nonrecovery of the buy money, its precipitous discharge of a sworn juror and denial of a full and fair opportunity to cross-examine the witnesses against him require reversal and a new trial. We agree.

During deliberations, the jury inquired, "Does the judge's charge on not speculating about evidence that we do not have also apply to the buy money?" Before answering, the court stated that if the jury believed that La Torres gave defendant the buy money, then "the only reasonable inference" was that defendant disposed of it. Objecting that the court would be "telling [the jurors] how to reason", defense counsel asked that the court answer the question "yes" or, at the very least, instruct the jury on the consequence of disbelieving La Torres. Instead, it instructed:

"The general charge about not speculating applies to everybody. You're not supposed to guess.

"I guess there's a problem with knowing when something is speculation and when it's not.

"For instance in the example that I gave you about snowing, when you're asleep you're not speculating as to whether it snowed during the night. You know there was no snow on the ground when you went to sleep, you know the ground is all covered with snow when you got up. The only inference that can be drawn is that it must have snowed during the night.

"That is not speculation. That is not a guess. Even though you didn't see it it is a reasonable inference and a logical conclusion which can be drawn from a given factor.

"With reference to the buy money, it doesn't matter whether it is buy money or anything else. Let us assume that you believe the testimony of LaTorres that he gave $20 to Mr. Watkins. We believe it now we have a situation where there was a hiatus of five minutes during which time Mr. Watkins went into a store, whatever and after that he was searched and the money is not there. Obviously he could have disposed of the buy money.

"Put it somewhere, given it to somebody, anything could have happened to it.

"During the five minutes, because there's a five minute interval, you can't logically come to the conclusion that because he didn't have the money five minutes later it was never given to him. That's quite obvious.

"Let us assume he gave him a sandwich and he saw him three hours later, he didn't have the sandwich on him, maybe he ate it.

"You certainly couldn't draw the inference from the fact that he didn't have the sandwich on him three hours later that he was never given the sandwich. It's not logical. And the same thing with the cat and the mouse.

"If you believe that the mouse was put in the box and when you open the box the mouse isn't there and there's no way in which the mouse could have escaped, the only other way which would make the mouse disappear would be that the cat ate the mouse.

"But once you know there's a little hole in there, then the mouse could have escaped and then you can't say that the cat ate the mouse.

"It's the same thing with the five minutes. There's a little hole in there and the money could have escaped, could have been lost, could have been given away. Anything could have happened to it. You can't say that he didn't have it.

"But here what you've got is direct evidence. We're not dealing with circumstantial evidence.

"Police Officer LaTorres took the stand and he took the oath and he said I bought $20 worth of coke—what is it—crack, from Mr. Watkins, and I gave him $20.

"You believe him or you don't believe him and you have the right to believe him and you have the right not to believe him.

"You can test it, you can scrutinize his testimony the same as you would that of any other witness. Does it make sense the whole operation, everything you heard about the buy and bust operation, the back-up team, the field team, they go into a particular location to try to buy crack. Does it make sense? How does it tie in with the testimony of Police Officer Almond, the evidence, everything else you take into consideration, making a determination of whether or not the People have proven their case to your satisfaction through the testimony of those witnesses beyond a reasonable doubt.

"There is no easy solution that I can give you. You can't say well because he doesn't have the money on him five minutes later it was never given. It's five minutes.

"You can't reason so that's not a fair and it's not a reasonable inference, the inference has to be fair. It has to be reasonable it has to be logical. So you can't speculate. You can't guess of course not.

"You can't say maybe this or maybe that. That you're not allowed to do.

"But you could either believe LaTorres or not.

"You could either believe Police Officer Almond or not. That's what you're here for.

"So you take the whole picture and you use the same test that you use in your everyday affairs.

"Do these police officers have a motive not to tell the truth? Do they have an interest in the outcome of this particular case? Do they gain by it or lose by it?

"Use the same tests that you use in your everyday affairs.

"Does it make sense? That's the best I can tell you. No magical formula that I can give you. I've told you from the beginning.

"Some people think that if a man scratches his nose like this, he's not telling the truth. I can't tell you that. No such easy way. I hope I have answered your question and that it will help somewhat."

Defense counsel excepted to the instruction as biased, complaining that, having reasoned for the jury, the court presented examples consistent only with the inference of guilt without alternatively asking the jury to presume innocence or infer from the absence of buy money that La Torres never gave $20 to defendant.

■ A trial court must give balanced instructions *(People v*

*Bell,* 38 NY2d 116, 120) and avoid even the appearance of bias. *(United States v Mazzilli,* 848 F2d 384, 388.) Thus, in its instructions to the jury, a court may not suggest its own opinion as to guilt *(see, People v Brown,* 129 AD2d 450), direct a finding of any issue of fact *(People v Lewis,* 64 NY2d 1031, 1032; *People v Walker,* 198 NY 329, 334), marshal the evidence more favorably to one side *(People v Bell, supra,* at 122) or use biased hypotheticals *(see, People v Hommel,* 41 NY2d 427, 429-430; *see, also, People v Roman,* 149 AD2d 305). In our view, each of these mandates was violated by the court's supplemental charge.

Accepting the People's version of the incident, the nonrecovery of the buy money was an unremarkable event, easily accounted for. If, however, that version was rejected, in whole or part, or viewed with skepticism, such nonrecovery could be critical. Yet, when the jury asked about the buy money, the court, over objection and over the span of four transcript pages, replete with hypotheticals, instructed the jury how to reconcile this crucial lack of evidence with defendant's guilt. This bias deprived defendant of a fair trial.

Although the court did instruct the jury that it had the right to believe or disbelieve Officer La Torres, the supplemental charge's basic theme was the reconciliation of guilt with the nonrecovery of the buy money. In that regard, the court offered various explanations—"Obviously he could have disposed of the buy money. Put it somewhere, given it to somebody, anything could have happened to it"—and posed one hypothetical after another—the snow, the sandwich, the cat and mouse—in support of the inference of guilt. In concluding the cat and mouse analogy, the court noted, "Its the same thing with the five minutes. There's a little hole in there and the money could have escaped, could have been lost, could have been given away. Anything could have happened to it. You can't say that he didn't have it." As defense counsel noted in excepting, the court's charge ignored another valid reasoning process, i.e., that the nonrecovery of the buy money could contribute to a reasonable doubt. Contrary to the court's explicit prohibition, the jury was also entitled to infer that defendant had never been given the money.

Moreover, the court, after giving its hypothetical examples, reminded the jury that "here what you've got is direct evidence", thereby stressing that the inference of guilt was even stronger than in the hypotheticals. Similarly pointed was its reminder that Officer La Torres "took the oath". Such an

instruction improperly limited the jury's task to that of resolving credibility. By asking the jury to consider that La Torres took an oath, to examine whether the police had a motive to lie or any interest in the outcome or anything to gain by lying, and to determine whether the "whole operation" makes "sense", the court diminished the claim of mistaken identity, which was a focal point of defendant's summation.

That the buy money was never recovered was a crucial aspect of defendant's challenge to the credibility of the police officers and the thoroughness of their investigation and the court all but told the jury not to attach any significance to that evidence. *(See, People v Rodriguez,* 141 AD2d 382, 385.) Since, as is evident from the jury's question, the nonrecovery of the buy money was a concern, the court's supplemental charge on that subject necessarily unfairly affected its deliberations *(see, e.g., People v Gaston,* 75 AD2d 561, 562; *People v McCullough,* 73 AD2d 310, 319) and warrants a new trial.

■ With respect to the discharge of a sworn juror, on Friday morning, at approximately 11:15, after two days of taking testimony, the court announced that "we will have to" replace juror Smith, who had called in sick. In response to defense counsel's inquiries, the court ascertained that the juror had called in at 9:30 that morning complaining of pain in his left side and difficulty in walking; he was on his way to the hospital and would contact the court as soon as he knew more about his condition. Defendant's attorney asked that the court defer any decision until the juror called and that the juror be given until the end of the day to ascertain the nature of his illness. The prosecutor opposed any delay since a People's witness, Ali, a chemist, was waiting to testify. Defense counsel pointed out that since there was only one remaining alternate the court was risking a mistrial by a substitution. Moreover, he argued, since the court intended to charge on Monday, a weekend adjournment was already contemplated. Counsel offered to consent to the substitution on Monday if Smith were still unavailable. At 11:25 the court discharged Smith and seated the alternate juror. Smith called two hours later. Diagnosed as having an intestinal virus, he had been sent home and told to stay in bed and take medicine. When defense counsel complained that the decision to discharge Smith had been hastily made and that, even with the new information, the case should have been adjourned, the court justified its action by stating, "[I]t was 11:30 and he was supposed to be here at 9:30 and didn't show up. That's all I need." In

discharging juror Smith as it did, the court denied defendant his constitutional and statutory right to a jury of his choice.

In *People v Page* (72 NY2d 69), the Court of Appeals articulated the criteria to be applied by a trial court in determining, pursuant to CPL 270.35, whether to discharge a sworn juror as unavailable for continued service: "[I]llustrative factors that may be considered * * * include the stage of trial, the expected length of the absence of the juror if known, whether the juror's return is ascertainable and reasonably imminent and certain, whether reasonable attempts have been made to locate the absent juror, and other relevant circumstances such as the continued availability of key witnesses." *(Supra,* at 73.) The trial court must conduct "a reasonably thorough inquiry and recitation on the record of the facts and reasons" for the discharge; it must, at a minimum, make a "reasonable attempt to ascertain where the absent juror is, why the juror is absent, and when the juror will be present." *(Supra,* at 73.)

In *Page*'s companion case, *People v Washington,* the discharge of the juror was upheld since the trial court, despite "repeated and numerous" attempts, had been unable to locate the juror and thus had no basis for assessing his availability. In fact, the court had reason to believe that he was avoiding jury service. On the other hand, in *Page,* where the trial court had discharged the juror merely because she had called to say that "she'll get here when she can", a new trial was ordered since the court "failed to ascertain when the absent juror might arrive" and had not made the "reasonable effort" required to justify the discharge. *(Supra,* 72 NY2d, at 71-72, 74.)

The decision here to discharge juror Smith was as precipitous as in *Page (supra).* Smith, acting responsibly, had called the court at 9:30 A.M. and had promised to call again as soon as he had further information as to his medical problem. Presumably, he would be equally responsible and punctual in giving notice as to his continued unavailability or expected return. Unwilling to wait for the juror's response and measuring its obligation purely in terms of the passage of time—a scant two hours—the court rejected its opportunity and abjured its responsibility to ascertain whether the juror's return was "reasonably imminent and certain".

Nor do the other criteria cited in *Page (supra)* justify the court's refusal to wait to hear from juror Smith. The "continued availability of key witnesses" factor supported defense

counsel's request. At the time, the People had only one remaining witness, police chemist Ali, to call. As a professional witness to whom scheduling delays are fairly routine, his continued availability was assured and the People did not suggest otherwise. Since some inconvenience is presumed by the prohibition against premature discharge of a juror and witness inconvenience was the only stated opposition to the requested adjournment, a sufficient basis for the discharge had not been established.

Moreover, given the late "stage of trial"—another *Page* factor—the court, by substituting the only remaining alternate, risked a mistrial in the event any other juror became unavailable. Significantly, the court, having previously announced that it would not charge until Monday, was going to continue the trial into the next week anyway. Since the case was not at all complex, consuming just two days of testimony from only three witnesses, an adjournment to await Smith's call or, at worst, until Monday, especially in light of defense counsel's willingness to consent to the substitution at that time should Smith still be unavailable, was a reasonable alternative. *(See, e.g., People v Polhill,* 140 AD2d 462, 463, *lv denied* 72 NY2d 923; *People v Rosa,* 138 AD2d 753, 755, *lv denied* 72 NY2d 866.)

Nor did the information provided in Smith's second call justify his discharge. He stated that he had been released from the hospital, given medicine, and told to stay in bed. Since he had already been excused, no inquiry was made as to when he would be available. Given the diagnosis of intestinal virus, Smith likely would have been ready to resume jury service on Monday. Under these circumstances, a weekend adjournment was a relatively insignificant but reasonable and necessary price to pay to safeguard the important right at stake.

■ We also find that the trial court's refusal to allow cross-examination of the police chemists as to the reliability of their procedures and of the police officers as to their failure to secure corroborative evidence deprived defendant of a fair trial. On numerous occasions the court rebuffed and openly demeaned defense counsel's efforts to underscore perceived absences of incriminating evidence. For example, since contaminated or disproportioned chemicals could skew, and, indeed, render false positive, test results with respect to the contents of the four vials sold to La Torres and the two recovered from Lloyd, defense counsel attempted in his cross-

examination of the officers to establish that sales of bogus drugs were not uncommon. Through the chemists, he would elicit their procedures, their inability to attest personally to the quality of the reagents and acids they used and, hopefully, their concession that test results could be affected by certain variables. The court, however, *sua sponte,* condemned counsel's questioning of Officer Almond as to "wack" drugs, i.e., not controlled substances, with the comment, "Come on, if you're not making an objection, the court will", struck the testimony, said that it was "irrelevant", and told the jury to disregard it. As to the chemists, after police chemist Mesticampo recited, on direct examination, her bare conclusion as to the presence of cocaine, defense counsel sought to inquire about her procedures. The court demanded to know what counsel intended "to prove", asked if he had "any evidence" that the substance was not cocaine, faulted him for not having his own chemist and "evidence to refute her" and concluded, "[W]hat do I care what [the chemist] did, she's an expert, that's what she said, you don't have evidence to the contrary." When counsel later explored the possibility of skewed test results with Mesticampo, the court, again, *sua sponte,* aborted all further inquiry: "Stop it. I forbid you to cross-examine this witness any further along those lines." In response to counsel's lament that Mesticampo could not attest to the accuracy of the test results unless she knew the purity of the chemicals and what might skew the results, the court noted, "She knows because she's telling you it was accurate." Counsel's attempt to explore this subject with the other chemist, Ali, was similarly rebuffed by the court as irrelevant.

The court's prohibitive rulings stemmed from its mistaken belief that defendant could not challenge the People's opinion evidence unless he had his own expert evidence to the contrary. When an expert states his/her conclusion on direct examination, the cross-examiner is entitled to inquire as to the basis of that opinion *(see, Caton v Doug Urban Constr. Co.,* 65 NY2d 909, 911; *see also, People v Jones,* 73 NY2d 427, 430-432), as well as to explore the possibility of a flawed test result. The inquiry challenging the test results may include whether the expert's procedure was reliably performed, whether the chemicals used were what they purported to be and the expert's knowledge as to how variables can alter the test results. Since defendant's entire challenge to the People's expert testimony was not only precluded, but demeaned as well in front of the jury, the prejudice is obvious. Nor, since

the chemists' testimony was an essential part of the People's case, can the error be deemed harmless beyond a reasonable doubt.

In his effort to demonstrate a reasonable doubt, defense counsel sought to underscore the lack of objective proof and thereby reduce the People's case to the credibility and reliability of Police Officers La Torres and Almond. Thus, he elicited from La Torres that this buy and bust operation did not employ an observation "ghost" or use recording/transmitting devices (KELS and NAGRAS) as had been the case in other buy and bust operations in which La Torres participated. The court precluded further inquiry along those lines, interjecting, *sua sponte,* at one point, "I don't want anyone questioning about KELS and NAGRAS. And the jury will disregard that completely, nothing to do with this case what they do in other cases or how the police do it in other cases." Apparently, the court was of the view that the absence of such objective evidence was not "a lack of evidence". Most telling was its rationale in so ruling, "[Y]ou can list a hundred things that they didn't use, what does it have to do with this case if he made the sale." Later, in its charge, the court stressed not only that the People had "no requirement" to produce such evidence but also that this failure to do so, contrary to what defense counsel urged in his summation, "is not a basis for finding a reasonable doubt." That the prosecutor had first questioned both officers extensively about prototypical buy operations, including that an arrest is based on a description and confirmatory identification, that buy money is not always recovered and the type of equipment that is usually worn, only exacerbated the unfairness of the ruling and its harm to defendant. While the police were not required to use an observation "ghost" or recording/transmitting devices, their decision not to utilize such procedures in this case was a factor the jury could consider, for whatever its worth. *(Cf., People v Gonzalez,* 68 NY2d 424.) Since defendant was deprived of the right to subject adverse witnesses to a full and vigorous cross-examination on matters essential to the defense, he is entitled to a new trial.

■ Finally, one other cited error, although without merit, warrants discussion since it may have a bearing on any retrial. In questioning Officer Almond at the *Mapp* hearing, defense counsel ascertained that she had worked overtime on December 15, 1987 and had submitted an overtime voucher, a copy of which had not been provided to the prosecutor. When

counsel asked the motion court to examine a copy of the report to determine if he was entitled to it, the court questioned the officer about the document's contents. She explained that she did not "keep copies[, t]hey go to the time records" and testified that the voucher bore "the date, the amount of overtime worked, what the overtime was for, which would be buy operation and the number of this buy operation, my signature and my sergeant's signature and possibly the lieutenant's signature." In response to the court's question whether she "described what happened on the scene at all," Officer Almond stated, "No". She further explained that the voucher "asks for the reason" for the overtime and "you put the buy operation number and if you are the arresting officer the arrest numbers." In response to further inquiries by defense counsel, Officer Almond testified that the voucher mentioned the "time of the arrest" in the form of a listing of "the time of the incident" and that it did not state either the names of the persons arrested or the crimes charged. After this testimony, the court denied defendant's request that he be furnished with a copy of the voucher. Before opening statements, counsel renewed his request that the voucher be turned over or inspected in camera. The Trial Judge, noting that it was bound by the hearing court's ruling, denied both requests. On appeal, defendant argues that the People's refusal to turn over the overtime voucher constituted reversible error. We disagree.

On our review of the record, we find that the overtime voucher is not *Rosario* material. The People's obligation in that regard is to provide a defendant, in timely fashion, with copies of any "written or recorded statement" made by any of their witnesses which "relates to the subject matter of the witness's testimony." (CPL 240.44 [1]; 240.45 [1] [a]; *see, People v Rosario,* 9 NY2d 286, 289, *cert denied* 368 US 866.) What is determinative is that the witness's statement be relevant to the subject matter of his/her testimony; that the statement may possibly otherwise be beneficial to the defense is of no moment. *(Cf., People v Perez,* 65 NY2d 154, 159.)

As is clear from the hearing record, Officer Almond's overtime voucher contains no factual assertions about or descriptions of the events which were the subject matter of her testimony, i.e., the sale of crack to Officer La Torres by defendant and Kevin Lloyd and their subsequent search and arrest. Indeed, defendant concedes as much by arguing only that the voucher should have been disclosed "to the extent

Almond had noted the times of the sale and arrest". Even that point is misleading since Officer Almond testified that the overtime voucher noted the "time of the incident" and, when asked if it bore the "time of the arrest", stated, "That's the incident time, yes." Thus, the document apparently recorded the time of only one of these two events, i.e., the "incident".

Finally, it bears noting, if a discrete item of recordkeeping so tangentially related to a police officer's testimony as an overtime voucher were construed to be a statement within the sweep of *Rosario,* the potential consequences to the criminal justice system would be staggering. Given the size of the New York City Police Department, there are no doubt countless forms, which have nothing to do with a criminal investigation or apprehension, but which police officers are required to fill out and file solely for administrative purposes. Yet, such a document, a log, for instance, recording the time of use of a police vehicle, might contain a single, isolated entry bearing on some aspect of a crime, perhaps the operator's recollection of the time of its occurrence. Should a conviction be reversed and a new trial ordered for the good-faith nonproduction of such a document? Merely to pose the question, we submit, is to suggest the answer.

This is, of course, not to suggest that if some obscure police department form did contain a witness's statement which related to the subject matter of his testimony, the People should be relieved of their obligation to produce the document merely because it is solely the product of bureaucratic concerns. Absent the confidentiality considerations which may justify nondisclosure *(see, People v Poole,* 48 NY2d 144, 149), the People, despite the obscurity of the document, would be charged with notice of it and required to obtain and produce it. Nor do we hold that a single word or item of data on a police department form can never be viewed as a "statement" which "relates to the subject matter of [a] witness's testimony". There are no doubt cases in which a particular discrete entry is central or relates directly to the subject matter of a witness's testimony. Such, however, is not the case here. Standing alone, the time of the incident was of no consequence at all and thus the notation on the overtime voucher should not be viewed as a statement within the reach of *Rosario.*

Accordingly, the judgment of the Supreme Court, New York County (John A.K. Bradley, J., at suppression hearing; Allen

M. Myers, J., at trial and sentence), rendered September 7, 1988, convicting defendant of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree and sentencing him, as a predicate felony offender, to concurrent indeterminate terms of from 4½ to nine years, should be reversed, on the law, and the matter remanded for a new trial.

CARRO, MILONAS, KASSAL and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, rendered on September 7, 1988, unanimously reversed, on the law, and the matter remanded for a new trial.